Michael L. SHAKMAN and Paul M. Lurie et al., Plaintiffs,

v.

The DEMOCRATIC ORGANIZATION OF COOK COUNTY; Democratic County Central Committee of Cook County and all its members; George W. Dunne, Individually and as President of the Board of County Commissioners of Cook County, as President of the Board of Commissioners of the Forest Preserve District of Cook County, and as Chairman of the Democratic County Central Committee of Cook County; City of Chicago, a Municipal Corporation; Jane R. Byrne, Mayor of the City of Chicago; Morgan M. Finley, Individually and as Clerk of the Circuit Court of Cook County; Edward J. Rosewell, Individually and as Treasurer of Cook County, Stanley J. Kusper, Jr., Individually and as Clerk of Cook County; Thomas C. Hynes, Individually and as Assessor of Cook County; Forest Preserve District of Cook County, a Municipal Corporation; Richard J. Elrod, Individually and as Sheriff of Cook County; the Chicago Park District, a Municipal Corporation; et al., Defendants.

No. 69 C 2145.

United States District Court, N. D. Illinois, E. D.

Sept. 24, 1979.

C. Richard Johnson, Chicago, Ill., for plaintiffs.

William R. Quinlan, Corp. Counsel, Foran, Wiss & Schultz, John A. Dienner, Asst. State's Atty., Peter Fitzpatrick, Chicago, Ill., for defendants.

## OPINION

BUA, District Judge.

This is a class action brought under the first amendment, the equal protection clause of the fourteenth amendment, and 42 U.S.C. §§ 1983 and 1985, challenging the patronage practices of the regular Democratic and Republican Party organizations in most of the Northern District of Illinois. Plaintiffs are independent candidates, voters, and taxpayers. The defendants include various government officers at the state and local levels, local government entities, and local organizations and officials of the two major political parties. Plaintiffs' principal theory is that the use of state and local government patronage power to coerce political support for the regular Par-

ty organizations and their candidates violates independents' rights to fair and equal participation in the electoral process. By way of redress, plaintiffs seek declaratory and injunctive relief.

This case has a long history in this court. A 1969 dismissal of this action by Judge Marovitz was reversed by the Seventh Circuit in 1970. Following that reversal, plaintiffs entered into a consent decree with many of the Democratic and Republican defendants. The consent decree resolved most of the issues as to those defendants. Stipulations of fact were then filed as to (1) the remaining issues between plaintiffs and the Democratic defendants who are parties to the consent decree, and (2) all issues between plaintiffs and the Democratic defendants who are not parties to the consent decree. These matters are now before the court on cross-motions for summary judgment.

## I. INTRODUCTION

Plaintiff Shakman is a resident of the City of Chicago and the County of Cook. Running in his home district, Shakman was an independent candidate in the November, 1969, election for delegates to the 1970 Illinois Constitutional Convention. At the time of that election, plaintiff Lurie was a resident of the same district. Lurie was one of those voters who supported Shakman's candidacy. In October, 1969, the plaintiffs filed the original complaint in this action, attacking the patronage practices of the regular Democratic Party organization in Chicago and Cook County. Those named as defendants included the City and its Mayor, various County officers, the Democratic County Central Committee, and the Democratic Organization of Cook County.

The primary factual allegations of the original complaint may be summarized as follows. The regular Democratic Party organization has long enjoyed a position of strong dominance in Chicago and in Cook County as a whole. This position has allegedly given the Democratic County Central Committee and the Democratic Organi-

zation of Cook County a great deal of control over the various offices, departments, and agencies of the City, the County, and many of the suburban political entities located within the County. These government offices, departments, and agencies employ thousands of persons who are not selected on a merit basis and are not protected by statute from arbitrary discharge. Many are even employed on "temporary" terms which require that their employment be renewed every several months. At the time the complaint was filed, most of these non-protected employees were required, in order to obtain their government jobs, and in order to keep those jobs or to avoid some form of job-related discipline, to have the "sponsorship" of some appropriate individual connected with the Democratic Party organization. These employees are referred to as "patronage employees." In order to secure and maintain the necessary sponsorship, patronage employees were allegedly required to contribute or promise to contribute and to do or promise to do political work for the Democratic organization and/or its candidates. According to the complaint, patronage employees were often required to do involuntary political work on public time, or to take time off their government jobs to do such work.

Thus, using governmental power and, directly or indirectly, public funds, the defendants allegedly control by coercion the political behavior of patronage employees. This enables the defendants to generate a massive political effort in favor of their organization and its candidates. The end result, plaintiffs claim, is a substantial electoral advantage for regular Democratic Party candidates, with a corresponding disadvantage to opposing candidates and voters.

Defendants' patronage practices were alleged to infringe, *inter alia*, (1) the rights of plaintiff Shakman, as an independent candidate, to associate with actual and potential supporters and to be free from invidious discrimination, (2) the rights of both plaintiffs, as independent voters, to associate and to cast their votes effectively in an electoral process free from substantial partisan interference, (3) the rights of both plaintiffs, as taxpayers, to be free from coerced political contributions to the Democratic Party organization and its candidates, and (4) the rights of the patronage employees to speak, vote, and associate. In addition to other relief, plaintiffs sought a permanent injunction in effect forbidding the use of any political considerations in employment practices of the government defendants.

The original complaint consisted of six counts. Counts I and IV sought relief on behalf of plaintiff Shakman and all other independent candidates similarly situated, including those in future elections. Counts II and V sought relief on behalf of both plaintiffs and all other independent voters similarly situated. Counts III and VI sought relief on behalf of both plaintiffs and all similarly situated taxpayers. Counts I, II, and III alleged the direct liability of each of the defendants for every wrong of which plaintiffs complained. Counts IV, V, and VI were corresponding counts alleging conspiracy liability.

Shortly after the complaint was filed, all of the defendants moved to dismiss it, raising a variety of arguments. Judge Marovitz granted these motions. *Shakman v. Democratic Organization of Cook County*, 310 F.Supp. 1398 (N.D.Ill.1969). Judge Marovitz's dismissal was based on the twin grounds that the plaintiffs lacked standing to sue and that the allegations of the complaint were conclusory. Regarding standing, the court found that plaintiffs as candidates, voters, and taxpayers, could not assert the constitutional rights of patronage employees. 310 F.Supp. at 1401. Turning to the allegations that plaintiffs' own rights have been violated, the court reasoned that any violations of plaintiffs' own rights were merely derivative of the alleged violations of the rights of patronage employees. *Id.* In view of this disposition, the court found it unnecessary to determine whether plaintiffs' claims presented non-justiciable political questions. 310 F.Supp. at 1400.

On appeal from the dismissal, the Seventh Circuit reversed. *Shakman v. Democratic Organization of Cook County,* 435 F.2d 267 (7th Cir. 1970). While plaintiffs' appeal from Judge Marovitz's order was pending, the November, 1969, delegate election took place. Shakman was defeated by 623 votes. A regular Democrat and an independent were elected delegates in the 24th senatorial district. After observing that these circumstances did not moot the case, the court of appeals examined and rejected the grounds for dismissal relied upon by the district court. As to standing, the court found no need to decide whether plaintiffs could assert the rights of patronage employees, or whether plaintiffs' interests as taxpayers would alone be sufficient to confer standing. Instead, the court simply stated that insofar as plaintiffs sought redress for injuries to their own interests as candidates and voters and the interests of others similarly situated, standing, *per se,* was no obstacle. 435 F.2d at 269.[1] Also, while agreeing that some parts of the complaint were conclusory and reflected questionable legal analysis, the court concluded that "the averments concerning the operation of the patronage system and the disadvantage it causes to candidates and voters who attempt to use the election process to change the direction of government are factual and give adequate fair notice of the claim asserted." 435 F.2d at 270.

The court then addressed two remaining questions of crucial importance: whether the alleged disadvantages to the interests of independent candidates and voters constituted a deprivation of any right or rights secured by the constitution, and whether the case was for any reason non-justiciable. In considering the status of plaintiffs' interests, the court referred to a number of Supreme Court decisions dealing with inequalities in election procedures, *e. g., Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23

L.Ed.2d 1 (1969); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944). These cases were found to support the proposition that both a candidate's rights to an "equal chance" and a voter's right to an "equally effective voice" are entitled, under the equal protection clause, to protection from invidious official discrimination. The court recognized that in the present case these rights were allegedly impaired in a different manner than in the election procedure cases. Nevertheless, it found those cases to be controlling:

> We acknowledge that the decisions just referred to involved mechanical aspects of the election process: e. g., the right to cast a vote, a candidate's place on the ballot, and equal size districts entitled to a representative. The interest in an equal chance and an equal voice is allegedly impaired in the case before us by the misuse of official power over public employees so as to create a substantial, perhaps massive, political effort in favor of the ins and against the outs. We conclude that these interests are entitled to constitutional protection from injury of the nature alleged as well as from injury from inequality in election procedure.

435 F.2d at 270.

Finally, the court rejected the argument that the case was nonjusticiable:

> One may foresee that in the areas of proof, and devising relief if the claims be proved, care will be required in order to distinguish between compelled and voluntary political support by public employees. Except to the extent some statute validly restricts political expression or activity by public employees, such individu-

---

1. It is now clear that the plaintiffs' status as taxpayers would not give them standing in this case. Taxpayers have standing to challenge only those expenditures that violate a constitutional provision which is recognized as a specific limitation upon state power to tax and spend. *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Frissell v. Rizzo,* 597 F.2d 840, 850 (3d Cir.), *cert. denied,* —— U.S. ——, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). The defendants are therefore entitled to summary judgment on Counts III and VI.

als enjoy the same right of political association and expression on their own time, as anyone else.

We do not view possible difficulties of the sort just mentioned as demonstrating a "lack of judicially discoverable and manageable standards for resolving" the case or as requiring, at the pleading stage, a decision that plaintiff's claim is not justiciable.

435 F.2d at 271.

After the Supreme Court denied certiorari, 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650 (1971), settlement negotiations began. Several months later, all parties agreed, on certain conditions, to the entry of a consent decree. A copy of the proposed decree was tendered to the court in October, 1971. In essence, the decree purported to free those *already hired as government employees* from all coercion to make political contributions or to do political work, and from any form of employment discrimination based on political considerations. In a letter which accompanied the consent decree, the parties set forth the agreed preconditions to its entry. First, plaintiffs were to arrange to have the operative terms of the agreement apply as well to the Republican Governor's patronage in the Northern District of Illinois, and to the Chairman of the Republican County Central Committee of Cook County. Second, the consent decree was to be approved by the court as a settlement under Rule 23(e), Fed.R.Civ.P.

Pursuant to their agreement, plaintiffs filed an amended complaint, adding counts VII and VIII. These counts contain allegations analogous to those in the original six counts, but directed toward the patronage practices of the regular Republican Party organization in the Northern District of Illinois outside the City of Chicago. Those named as defendants in counts VII and VIII include various state government officers, the Republican State Central Committee and its Chairman, the Republican County Central Committee for each of the eight counties then in the Northern District of Illinois, Eastern Division, and various government officers and Republican Party officials in the subject counties. Many of the Republicans, including the Governor and the Chairman and other members of the Republican County Central Committee of Cook County agreed to be bound by the terms of the proposed consent decree.[2] All of the Democratic defendants, except Cook County Sheriff Elrod and the Chicago Park District, agreed to the terms of the consent decree.

The court then certified classes of independent candidates, independent voters, and certain taxpayers on each of the eight counts of the amended complaint. Pursuant to Rule 23(e), notice of the proposed consent decree was given. In April, 1972, a hearing was held as to the propriety of the decree. Finally, on May 5, 1972, the court approved the proposed consent decree, and entered it.

The May 5, 1972, consent decree is attached as an appendix to this opinion. In its central provisions, the decree enjoined the defendants, their successors and agents, from "conditioning, basing, or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor," and from "knowingly causing or permitting any employee to do any partisan political work during the regular working hours of his or her governmental employment." Further, the decree specifically declared that "compulsory political financial contributions by any governmental employee, contractor or supplier" and "all compulsory or coerced political activity by any governmental employee" were prohibited, and that "once hired, a governmental employee is free from all compulsory political requirements in connection with his governmental employment." However, the decree expressly affirmed the rights of government employees to engage, voluntarily and on their own time, in any lawful political activity. Finally, the decree stated

2. The amended complaint and further supplements have also named additional Democratic officeholders as defendants, as well as several successors in office to those previously named.

that the court retained jurisdiction to determine, among other things, whether political sponsorship or other political considerations can lawfully be taken into account in the consenting defendants' *hiring* practices, and what further remedies or implementing procedures might be appropriate to enforce the terms of the decree.

Following entry of the consent decree, the various Democratic and Republican defendants who were not parties to the decree filed motions to dismiss. Judge Marovitz granted one of these motions in part. *Shakman v. Democratic Organization of Cook County*, 356 F.Supp. 1241 (N.D.Ill. 1972).[3]

After Judge Marovitz ruled on the motions to dismiss, the plaintiffs and the two Democratic defendants who were not parties to the consent decree, Cook County Sheriff Elrod and the Chicago Park District, negotiated stipulated statements of fact regarding all issues remaining in the case.

Subsequently, the Democratic defendants who were parties to the consent decree began to negotiate with plaintiffs in an effort to resolve without trial the factual issues relevant to their remaining dispute over hiring practices. The negotiations continued until the summer of 1977. At their conclusion, the following defendants submitted agreed sets of responses to requests to admit:

1. The Democratic County Central Committee of Cook County and its members, including its Chairman, George W. Dunne,

2. The City of Chicago,

3. George W. Dunne, individually and as President of the Board of Commissioners of Cook County,

4. Morgan M. Finley, individually and as Clerk of the Circuit Court of Cook County,

5. Thomas M. Tully, then the Assessor of Cook County,

6. Stanley J. Kusper, as Clerk of Cook County,

7. Edward J. Rosewell, as Treasurer of Cook County,

---

**3.** The motions to dismiss raised two important arguments. First, it was asserted that the Seventh Circuit's *Shakman* opinion did not condemn all hiring and firing of patronage employees based on political considerations, but only the use of hiring and firing practices to coerce political work or contributions. Judge Marovitz found this argument to be persuasive:

> . . . *Shakman* prohibits only political considerations *which effect voter and candidate rights.* The firing of Republicans by incoming Democrats and vice versa is permitted so long as retention is not conditioned on coerced political activity or contributions. Likewise, Republicans have every right to hire only Republicans and Democratic office holders have every right to hire only Democrats so long as coerced political activity is not a condition of that employment.

> . . . . .

> We therefore grant the defendant's motion to strike and dismiss those portions of the complaint which assert violations of rights through any political activity which does not affect voter-candidate-taxpayer rights and strike that portion of the prayer for relief which seeks the enjoining of *all* and *any* political considerations in public employment.

356 F.Supp. at 1248 (emphasis in original). Secondly, defendants argued that the Seventh Circuit's opinion prohibited only coerced political activity by government employees on public time, as opposed to the employees' own time. This argument, however, was rejected:

> The Court of Appeals decision both explicitly and implicitly indicated that *any* activity which effects *the voter-candidate-rights* of plaintiffs is prohibited and we believe that no distinction ought to be drawn between coerced political activity which is performed on public time and that performed on the employees own time if it emanates from the same source of coercion since both activities result in violations of plaintiffs' rights.

356 F.Supp. at 1248 (emphasis in original). To the extent that the first point made by Judge Marovitz rests on a holding that Democrats may fire Republicans as long as there is no coercion involved, it has been overruled by *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Illinois State Employees Union v. Lewis*, 473 F.2d 561 (7th Cir. 1972), *cert. denied*, 410 U.S. 928, 943, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); *see Lewis*, at 577–78 (Campbell, J. concurring), and is no longer good law, *see* pp. 1340–1341 *infra*. To the extent that Judge Marovitz held that plaintiffs could only receive relief for illegal practices that affected their own rights, his holding remains good law. *See* pp. 1328–1329 *infra*. *See also* note 6 *infra*.

8. The Forest Preserve District of Cook County, through its President, George W. Dunne.

Particular stipulations are discussed in greater detail below, see pp. 1342–1344, 1345–1349 infra, but the court will outline their scope here in order to facilitate full understanding of the legal issues.

The parties stipulated that in each ward of the City of Chicago and in many townships in Cook County there is a regular Democratic organization. The ward or township Democratic Party Committeeman is normally the head of the local organization, although certain regular organizations have separate heads in wards or townships controlled by "independents." The heads of the ward and township organizations sponsor candidates for public jobs with the City, Cook County, various County officers, the Forest Preserve District, and the Park District.

Preference in the hiring of employees for over 20,000 positions in these agencies is given to persons who have the sponsorship of a local organization head. Indeed, public notice of the availability of these jobs is not normally given. Usually, job applicants can only obtain Democratic sponsorship by having performed political precinct work or by promising to perform such work for candidates endorsed by the sponsor. Applicants will not normally be sponsored if they have been a worker for any political group opposed to the regular Democratic organization, although such persons are occasionally sponsored if they agree to switch political affiliations and work to support the regular Democratic organization. The sponsorship is usually communicated to the employing agency by means of a letter.

There are, on the average, over 250 governmental employees per ward in the City who were sponsored by the regular Democratic organization for their job. Since the City wards average about sixty precincts per ward, there are, on the average, about four patronage government employees in each precinct in the City. A significant number of these persons do political work on behalf of persons supported by sponsoring regular Democratic organization officials.

Most importantly, the defendants admit that the political precinct work done by these patronage workers "helps elect candidates supported by the various members of the Democratic County Central Committee." They also admit that "[t]his is one of the purposes of giving the preference in hiring." E. g., Response of City of Chicago to Request for Admission, at 3.

After the stipulations were completed, the plaintiffs filed a motion for summary judgment against two groups of Democratic defendants: (1) the "consenting defendants," consisting of the eight defendants who filed agreed answers to requests to admit, including the named individuals in their individual as well as official capacities, and Michael A. Bilandic, then mayor of Chicago, in both his individual and official capacities, and (2) the "non-consenting defendants," Cook County Sheriff Richard Elrod and the Chicago Park District. Plaintiffs' motion seeks determinations of liability as to the hiring practices of the consenting defendants and as to the full range of politically motivated employment practices of the non-consenting defendants. Plaintiffs ask that an injunction similar to the consent decree be entered immediately against the non-consenting defendants. They suggest, though, that the question of appropriate relief as to the defendants' hiring practices should be left for "subsequent resolution."[4] In support of their motion, plaintiffs rely on the responses to requests to admit and the stipulations of fact, as well as certain affidavits and oral testimony given at prior enforcement proceedings in this action. Both the consenting and non-consenting defendants have also filed motions for summary judgment, supported by addi-

---

4. The defendants oppose this suggestion. The court agrees with the plaintiffs that it is proper to decide the motions for summary judgment on the question of liability now, while reserving

questions of remedy for another day. See C. Wright & A. Miller, 10 Federal Practice and Procedure § 2736. See also R. Kluger, Simple Justice, 657–747 (1975).

tional affidavits and other evidentiary materials.

The stipulated admissions, affidavits, and testimony of the parties remove from the case all issues of material fact. Therefore, the court enters this opinion as a general discussion of the rationale for its decision on the ultimate issues of the case as raised by the pending motions for summary judgment. *See* 10 C. Wright & A. Miller, Federal Practice and Procedure § 2724, at 497–98; *Munoz v. International Alliance of Theatrical Stage Employees,* 563 F.2d 205, 213 (5th Cir. 1977); *Aluminum Co. of America v. Admiral Merchants Motor Freight, Inc.,* 337 F.Supp. 674, 688 (N.D.Ill.1972), *aff'd,* 486 F.2d 717 (7th Cir.), *cert. denied,* 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973).[5]

## II. PRELIMINARY LEGAL ISSUES RAISED BY THE PARTIES DO NOT CONTROL THIS CASE

Under normal procedures, the court would now evaluate the factual record in light of the legal standard set out in the court of appeals' remand opinion. It would scrutinize that record to determine if "there is no genuine issue as to any material fact and . . . [if] the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see, e. g., Cedillo v. International Association of Bridge Workers,* 603 F.2d 7, 9 (7th Cir. 1979). Both parties claim that upon completing this task, the court will find that they are entitled to summary judgment.

Both the defendants and the plaintiffs, though, also urge the court to consider a preliminary argument. The defendants argue that the Supreme Court's decisions invoking the principles of comity and federalism show that this court must refrain from granting the plaintiffs any relief. The

plaintiffs state that the Supreme Court's decision in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), which outlawed political patronage firing practices, is directly applicable to the facts of this case and requires the court to rule in the plaintiffs' favor. Each side says that if the court rules in its favor on its claim, the court need not reach the more difficult questions required by the normal approach.

A. *The Plaintiffs' Cause of Action Is Not Impermissibly Inconsistent With the Principles of Federalism and Comity*

■ The defendants, in their cross-motions for summary judgment, claim that the plaintiffs' cause of action impermissibly interferes with certain interests in federalism and comity recognized by recent Supreme Court cases. *See, e. g., Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Mayor v. Educational Equality League,* 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974); *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 614 (1974). They claim that granting the plaintiffs any relief would impermissibly interfere in the ongoing conduct of state government and violate fundamental principles of our federal system.

■ The court believes this argument is nothing more than an attempt to relitigate the issues of standing, justiciability, and the existence of a political question. Those issues were decided against the defendants by the court of appeals in the *Shakman* opinion, 435 F.2d 267, 270–71 (7th Cir. 1970), and that decision is the law of the case.[6] In any event, the Supreme Court's decision in *Elrod v. Burns, see* pp.

---

**5.** The court is also entering today certain specific supplemental findings of fact. The court finds that there is no genuine issue present concerning any of these facts. Since these findings are not likely to be of general interest, they are being released via an unpublished order, and not as part of this opinion.

**6.** The law of the case doctrine, *see, e. g., James Burrough Ltd. v. Sign of Beefeater, Inc.,* 572 F.2d 574, 577 (7th Cir. 1978), would not bar the court from ruling on the defendants' claim if there had in fact been a change in the law. A prior decision by an appellate court in the same case is not binding when "controlling authority has since made a contrary decision of the law applicable to such issues." *Morrow v. Dillard,*

1327–1328, *infra,* clearly establishes that illegal patronage practices can be challenged in court, and that the court has authority to grant relief to the plaintiffs, where appropriate, *Elrod v. Burns,* 427 U.S. 347, 351–53, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); *id.,* at 377 n.1, 96 S.Ct. 2673 (Powell, J., dissenting) (agreeing with plurality that patronage firing claims before the court were justiciable and not barred by the political question doctrine).

The defendants' talk of "dual sovereignties" will not be allowed to obscure the true issues in this case. Even though local authorities have the primary responsibility for dealing with local matters, if local authorities fail in their obligations under federal law, federal judicial authority may be invoked. *See, e. g., Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Elrod,* 426 U.S. at 352, 96 S.Ct. 2673 (1976) (plurality opinion); *Brown v. Board of Education,* 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 469 F.Supp. 836, 852–53 (N.D.Ill.1979).

### B. *The Supreme Court's Patronage Ruling in* Elrod v. Burns *Is Not Dispositive*

The plaintiffs invite this court to hold that a subsequent legal development entitles them to relief on grounds separate from those suggested by the Seventh Circuit's *Shakman* decision.[7] Three years ago, in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court held that patronage workers could not be fired because of their political affiliation. The plaintiffs suggest that the present case can be resolved simply by applying the *Elrod* holding to the patronage promotion and hiring issues present in this case.

Such an argument is very straightforward. The lead opinion in *Elrod,* written by Justice Brennan for a plurality of three Justices, found that the practice of patronage places substantial restraints on freedoms of belief and association.

Patronage . . . to the extent it compels or restrains belief and association, is inimical to the process which undergirds our system of government and is "at war with the deeper traditions of democracy embodied in the First Amendment." *Illinois State Employees Union v. Lewis,* 473 F.2d [561] at 576 [(7th Cir. 1972), *cert. denied,* 410 U.S. 928, 943, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973)]. As such, the practice unavoidably confronts decisions by this Court either invalidating or recognizing as invalid government action that inhibits belief and association through the conditioning of public employment on political faith.

427 U.S. at 357, 96 S.Ct. at 2682. The plurality opinion then rejected several proffered justifications for the practice of patronage firing, including the absence of any right to government employment, *id.* at 360–61, 96 S.Ct. 2673, the need to ensure effective government and the efficiency of public employees, *id.,* at 364–66, 96 S.Ct. 2673, the increased accountability to the public of patronage employees, *id.,* at 366–67, 96 S.Ct. 2673, the need for political loyalty of employees in order to assure that representative government is not undercut by obstructionist tactics, *id.,* at 367–68, 96 S.Ct. 2673, and the preservation of the democratic process, *id.,* at 368–72, 96 S.Ct. 2673.

■ There is no question that the rationale of the *Elrod* plurality opinion is applicable to the facts of this case.[8] *See, id.,* at 357–61 & 358 n.11, 359–60 n.13, 96 S.Ct. 2673. Nevertheless, the court cannot sim-

---

580 F.2d 1284, 1290 (5th Cir. 1978) (quoting *White v. Murtha,* 377 F.2d 428, 431–32 [5th Cir. 1967]); *see Kimball v. Callahan,* 590 F.2d 768, 771–72 (9th Cir.); *Chicago and North Western Transportation Co. v. United States,* 574 F.2d 926, 930–31 (7th Cir. 1978) (same); *Petition of United States Steel Corp.,* 479 f.2d 489, 494 (6th Cir. 1973) (same).

7. *See* note 6 *supra.*

8. Justice Powell, in his dissent in *Elrod,* implied that patronage hiring practices may infringe first amendment interests more strongly than patronage firing practices do. *See* 427 U.S. at 380–81 & 381 n.4, 96 S.Ct. 2673 (Powell, J., dissenting).

ply apply *Elrod* and hold that the defendants' conduct is illegal, for these plaintiffs do not have standing to attack the constitutional validity of the defendants' infringement of job applicants' rights.[9]

When the Seventh Circuit held that the plaintiffs' complaint in this case stated a cause of action, it did so because the plaintiffs alleged that the challenged patronage practices, if proven, infringed the plaintiffs' own rights as candidates and voters. Such an infringement creates a case or controversy between the plaintiffs and the defendants and gives this court so-called "constitutional" standing under Article III to adjudicate the complete legality of the challenged practices. *See Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Frissell v. Rizzo,* 597

---

**9.** In addition, the *Elrod* plurality opinion is not necessarily controlling. Justices Stewart and Blackmun, who concurred in *Elrod*, concurred only in the judgment. They specifically refused to join in the "plurality's wide-ranging opinion," and they also specifically declined "to consider the constitutional validity of a system that confines the hiring of some governmental employees to those of a particular political party . . . ." 427 U.S. at 374, 96 S.Ct. at 2690. Although Justice Stevens might well join the plurality, *see Illinois State Employees Union v. Lewis,* 473 F.2d 561 (7th Cir. 1972) (Stevens, Circuit Judge), *cert. denied.* 410 U.S. 928, 943, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); *sèe also Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 189, 99 S.Ct. 983, 994, 59 L.Ed.2d 230 (1979) (Stevens, J., concurring in the judgment) (Illinois cannot discriminate among political parties in access to the ballot), either Justice Stewart's or Justice Blackmun's vote would still be needed to create a majority. In order to apply the *Elrod* plurality's opinion to the promotion and hiring practices at issue in this case, this court would therefore have to compare that decision with other Supreme Court decisions to determine *Elrod*'s general validity.

Some courts and commentators have suggested that the *Elrod* plurality opinion is fully consistent with other Supreme Court decisions, and that basing hiring or promotion for government jobs on political affiliation is unconstitutional *per se. See Finkel v. Branti,* 457 F.Supp. 1284, 1289 n.9 (S.D.N.Y.1978) (*Elrod* concurrence and plurality both rely on *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 57 [1973] [broadly prohibiting the conditioning of government benefits on the exercise of first amendment rights]), *aff'd* 598, F.2d

---

F.2d 840, 843 (3d Cir.), *cert. denied,* —— U.S. ——, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). Alone, though, that is not enough to give the court final standing to proceed. The court must also apply certain non-constitutional, "prudential" standing rules to determine whether the plaintiffs are the proper parties to raise the job applicants' interests. *See Silva v. Bell,* 605 F.2d 978, 984 (7th Cir. 1979).

[E]ven when a litigant has demonstrated a concrete and particularized injury to himself, he is usually permitted to assert only his own legal rights as a ground for decision in his favor, not those of third parties not before the court. *Warth v. Seldin, supra,* 422 U.S. at 499, 514, 95 S.Ct. 2197; *United States v. Raines,* 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960).

609 (2d Cir.) (unpublished order), *cert. granted,* —— U.S. ——, 99 S.Ct. 3095, 61 L.Ed.2d 871 (1979); *Stegmaier v. Trammell,* 597 F.2d 1027, 1033–34 (5th Cir. 1979) (collecting authorities); *Rosenthal v. Rizzo,* 555 F.2d 390, 392 (3d Cir. 1977). *Cf. Keyishian v. Board of Regents,* 385 U.S. 589, 605–06, 87 S.Ct. 675, 685, 17 L.Ed.2d 629 (1967) ("the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected"); *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 569, 91 L.Ed. 754 (1949) ("[n]one would deny" "that Congress may not enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office") (dicta). *See generally Illinois State Employees Union v. Lewis,* 473 F.2d 561, 569–72 (7th Cir. 1972) (Stevens, J.) (discussing Supreme Court cases), *cert. denied,* 410 U.S. 928, 943, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). *See also Abood v. Detroit Board of Education,* 431 U.S. 209, 234, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977) (it is clear "that a government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment") (citing *Elrod* plurality opinion, *Perry,* and *Keyishian*). In addition, there is a strong argument that the Seventh Circuit's decision in *Lewis, supra,* demonstrates that the *Elrod* plurality opinion is the law in this circuit, and that patronage promotion and hiring practices may be illegal *per se* under applicable circuit authority. *Cf.* pp. 1353 1354 *infra.* Nevertheless, since the plaintiffs do not have standing to raise this point, it is not desired here.

*Frissell v. Rizzo,* 597 F.2d 840, 844 (3d Cir.) (in absence of any allegation that a newspaper had actually been inhibited in its reporting of the news by mayor's action in denying customary public advertising to the paper as a reprisal for the publication of unfavorable news articles, or that the newspaper was in some manner prevented from asserting its own first amendment rights, the taxpayer-citizen lacked standing to sue to vindicate the newspaper's rights), *cert. denied,* —— U.S. ——, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). The plaintiff class in this case was not certified as a class of government employees or applicants for government jobs. There has been no showing that the plaintiffs represent such government employees and applicants, or that the employees and applicants are for some reason unable or unlikely to bring suit themselves. Accordingly, the court must conclude that the plaintiffs are not proper parties for a challenge of patronage hiring and promotion practices as they affect employees and applicants. Instead, the defendants' conduct must be analyzed solely under the Seventh Circuit's decision in *Shakman* and other applicable court decisions interpreting the rights of candidates and voters.[10]

## III. THE LEGAL FRAMEWORK FOR REVIEWING THE CHALLENGED PRACTICES

A. *The* Shakman *Decision Does Not Provide Clear Guidance to This Court as to the Applicable Legal Framework for This Case*

In the years since the Seventh Circuit decided *Shakman,* the Supreme Court has developed a more complicated analytical framework for evaluating the constitutional validity of government laws or practices that are alleged to infringe on the first and fourteenth amendment rights of candidates and voters. In most recent first and fourteenth amendment cases, the Court specifically identifies the protected constitutional interests that are infringed. It then applies a balancing or strict scrutiny test, as appropriate,[11] to weigh the infringed rights against the interests asserted by the state to justify the statute. On the basis of that determination, the Court makes its ultimate ruling on the constitutionality of the challenged law or practice. In contrast, the operative section of the court of appeals' decision in *Shakman* is relatively brief.

It is clear that at least some aspects of the interests of candidates in an equal chance and of the interests of voters in having an equally effective voice are rights secured from state action by the equal protection clause of the fourteenth amendment.

The interests of candidates in official treatment free from intentional or purposeful discrimination are entitled to constitutional protection. "Where discrimination is sufficiently shown, the right to relief under the equal protection clause is not diminished by the fact that the discrimination relates to political rights." [Quoting *Snowden v. Hughes,* 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497 (1944).] The equal protection clause secures from invidious official discrimination the vot-

---

**10.** The plaintiffs also suggest that the court could grant them summary judgment on the issue of hiring merely as further implementation of the present consent decree. The court questions whether such a result would be possible, especially in the absence of documented, massive violations of the decree. That question need not be decided, though, given the result reached today by the court.

**11.** In first amendment cases of this nature, a balancing test is usually used. *See generally,* L. Tribe, American Constitutional Law, §§ 12–1 to 12–36 (discussing first amendment doctrine). Under fourteenth amendment analysis, strict scrutiny is applied when a fundamental interest or suspect classification is at stake. *See generally San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Tribe, §§ 16–1 to 16–57, 13–1 to 13–31.

In first amendment balancing cases that involve substantial infringements of protected first amendment rights, the balancing analysis usually reduces to the strict scrutiny test. *See* note 12 *infra.* Therefore, the court will occasionally use the phrase "strict scrutiny" to refer both to fourteenth amendment analysis and to the tilted first amendment balancing approach justified by the first amendment violations found herein.

er's interest in a voice in government of equal effectiveness with other voters.

We acknowledge that the decisions just referred to involved mechanical aspects of the election process: e. g., the right to cast a vote, a candidate's place on the ballot, and equal size in districts entitled to a representative. The interest in an equal chance and an equal voice is allegedly impaired in the case before us by the misuse of official power over public employees so as to create a substantial, perhaps massive, political effort in favor of the ins and against the outs. We conclude that these interests are entitled to constitutional protection from injury of the nature alleged as well as from injury resulting from inequality in election procedure.

435 F.2d at 270.

At first glance, the court of appeals decision appears to be lacking in instructions to this court as to how this court should proceed under a later-developed constitutional analysis. In the first paragraph, the court mentioned that "some aspects" of the rights asserted by the plaintiffs are "secured from state action by the equal protection clause of the fourteenth amendment." In the second paragraph, the court said that certain of the plaintiffs' "interests" were "entitled to constitutional protection." Though the third and fourth paragraphs have some specific language, the opinion concludes "that these interests are entitled to constitutional protection from injury of the nature alleged as well as from injury resulting from inequality in election procedure."

█ There are two apparent gaps in the opinion that make analysis difficult. First, while there is general discussion of the protected nature of "the voter's interest in a voice in government of equal effectiveness with other voters" and a right of some sort to protection "from injury resulting from inequality in election procedure," these rights do not appear to be precisely defined and their scope is not stated. Second, while the court of appeals repeatedly used the phrase "constitutional protection," it did not define the nature of that protection. The equal protection clause has been construed to provide protection against all government decisions to the extent that it forbids irrational classifications among those upon whom a challenged law or practice acts. See e.g., Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920); Brest, Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motivation, 1971 Sup.Ct.Rev. 95, 106–07. If the court of appeals meant to refer solely to this general protection, the challenged patronage practices would be subject to only a weak standard of review. See generally, e.g., San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). If the Seventh Circuit intended that this court apply a heightened form of judicial scrutiny, whether through a balancing test or through strict scrutiny, it failed to identify the manner in which this court would proceed. Thus, this court will have to turn to other, subsequent decisions in order to perform the necessary constitutional analysis of the factual stipulations submitted by the parties.

Unfortunately, the Supreme Court and the Seventh Circuit have followed more than one approach in analyzing possible infringements of first and fourteenth amendment rights. See Woodward v. City of Deerfield Beach, 538 F.2d 1081, 1082 n.1 (5th Cir. 1976).[12] Usually, the Supreme

---

12. Deprivations of political and associational rights can be analyzed under both the first and fourteenth amendments. See Police Department of Chicago v. Mosley, 408 U.S. 92, 95 n.3, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (collecting authorities). The Fifth Circuit's discussion of this point in Morial v. Judiciary Commission of Louisiana, 565 F.2d 295 (5th Cir. 1977) (en

banc), cert. denied, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978), is instructive.

The plaintiffs couch their complaint in the language of the equal protection clause of the fourteenth amendment as well as in the language of the first. While it is true that a first amendment claim typically takes the form of an assertion that the government cannot deprive the plaintiff of some freedom and an

Court identifies the protected constitutional interests infringed by the challenged government action, then evaluates the importance of the protected interests against the degree of the infringement and the weight and nature of the state interests that assertedly justify the decision. In some areas, however, the Supreme Court and Seventh Circuit have repeatedly faced similar fact patterns. In those cases, regularized analytical frameworks have developed.

■ This court will first undertake a "traditional" analysis of the challenged patronage practices to determine whether protected constitutional interests have been infringed. It will also evaluate the challenged practices against the group of Seventh Circuit cases that present factual circumstances most similar to those in the instant case. After concluding under both tests that the protected constitutional rights of the plaintiffs are infringed by the defendants' conduct, the court will strictly scrutinize those practices to determine whether they can be constitutionally justified.

### B. A Constitutional Analysis of the First and Fourteenth Amendment Interests at Stake

The purposeful attempt of the defendants to hinder independent candidates burdens central first and fourteenth amendment values.[13] A traditional constitutional analysis of the challenged patronage practices must begin with an identification of the

equal protection claim takes the form of an assertion that the government may not single out the class of which the plaintiff is a member for deprivation, it is equally true that every first amendment claim can be transformed into an equal protection claim merely by focusing upon the classification that every legislative scheme embodies. It is, therefore, generally appropriate to employ the same standard of scrutiny to the derivative equal protection claim as would be applied to the underlying claim of a substantive deprivation. See American Party v. White, 415 U.S. 767, 778, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The method of equal protection analysis, however, retains independent worth even in such cases. Highlighting the legislative classification serves to illumine the state's interest in burdening those of the plaintiff's class and the necessity of doing so in order to advance that interest.

565 F.2d at 304 (emphasis in original) (footnote omitted).

In first amendment cases, a court usually identifies the infringed first amendment rights and the asserted government interests. It then "balances" one against the other. The weight of the government interests needed to justify the decision and the closeness of the means-end "fit" between the interests and the decision varies directly with the importance of the plaintiff's infringed interests and the degree of the infringement. See Morial, 565 F.2d at 300; Barry v. District of Columbia Board of Elections, 448 F.Supp. 1249, 1252 (D.D.C.1978), appeal dismissed, 188 U.S.App.D.C. 432, 580 F.2d 695 (D.C.Cir.1978). Under the fourteenth amendment, certain kinds of classifications are subject to "strict scrutiny," while most classifi-

cations receive almost no scrutiny at all. See Wilson v. Harris, 478 F.Supp. 1046, 1049–50 (N.D.Ill. 1979) (collecting authorities). A sliding-scale balancing approach has generally been rejected under the fourteenth amendment. See Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). But see Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 188, 99 S.Ct. 983, 993, 59 L.Ed.2d 230 (1979) (Blackmun, J., concurring); Woodward v. City of Deerfield Beach, 538 F.2d 1081, 1082 n.1 (5th Cir. 1976) (suggesting that Supreme Court has used a balancing test in equal protection cases involving candidates). See also note 11 supra.

13. It is not relevant that the defendants are acting pursuant to their own discretion and that their conduct is not mandated by any statute.

The promise of equal protection of the laws is not limited to the enactment of fair and impartial legislation, but necessarily extends to the application of these laws. The basic principle was stated long ago in Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886):

"Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."

United States v. Falk, 479 F.2d 616, 618 (7th Cir. 1973) (en banc). Accord, Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

precise first and fourteenth amendment interests at stake. *See Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 183–84, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979) (equal protection case).

 The defendants' patronage hiring practices directly burden the plaintiff candidates' interests in running successfully for public office. Such a burden, however, is not by itself an infringement of constitutionally protected rights, for the Supreme Court has never recognized that interest alone as warranting special first amendment protection or as being a fundamental right under the equal protection clause. *See Bullock v. Carter,* 405 U.S. 134, 142–43, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Trafelet v. Thompson,* 594 F.2d 623, 632 (7th Cir.), *cert. denied,* —— U.S. ——, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979); *Newcomb v. Brennan,* 558 F.2d 825, 828 (7th Cir.), *cert. denied,* 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977). Instead, the Supreme Court and Seventh Circuit have recognized three closely related interests meriting special constitutional protection that are infringed or otherwise burdened by the defendants' challenged conduct. *See Newcomb v. Brennan,* 558 F.2d 825, 828 (7th Cir.), *cert. denied,* 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977); Note, Newcomb v. Brennan: *The Right of a Public Employee to Seek Political Office,* 73 Nw.U.L.Rev. 533, 535–37 (1978). They are: (1) the interests of the plaintiff candidates in political expression; (2) the interests of the plaintiff voters and candidates in association for the advancement of their political beliefs; (3) the interests of the plaintiff voters in equal participation in the electoral process. Taken together, *see Morial v. Judiciary Commission of Louisiana,* 565 F.2d 295, 301 (5th Cir. 1977) (en banc) (infringed interests must be aggregated to determine the degree of the constitutional violation), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395

(1978), these interests give a candidate a protected constitutional interest in freedom from official discrimination on the basis of his political beliefs.

### 1. *The candidates interest in political expression*

 Freedom from government-imposed restrictions on the content of belief or expression is the central premise of free speech as guaranteed by the first amendment.[14] *Abood v. Detroit Board of Education,* 431 U.S. 209, 234–35, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Elrod v. Burns,* 427 U.S. 347, 356, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Stanley v. Georgia,* 394 U.S. 557, 565, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Collin v. Smith,* 578 F.2d 1197, 1202 (7th Cir.), *cert. denied,* 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978). "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).[15] *See Karst, Equality as a Central Principle in the First Amendment,* 43 U.Chi.L.Rev. 20 (1975). This is especially true where political belief and expression are involved. "[I]t can hardly be doubted that the constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971). *See*

---

**14.** This is not to say that some narrow types of content restriction are not permissible. *See Collin v. Smith,* 578 F.2d 1197, 1202 (7th Cir.), *cert. denied,* 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978).

**15.** The Seventh Circuit has recently held that *Mosley* remains good law. *See Brown v. Scott,* 602 F.2d 791, 794 (7th Cir. 1979). *See also Collin v. Smith,* 578 F.2d 1197, 1202 (7th Cir.) (following *Mosley*), *cert. denied,* 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1979).

*Abood v. Detroit Board of Education,* 431 U.S. 209, 231, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *id.,* at 259, 97 S.Ct. 1782 (Powell, J., concurring in the judgment); *Buckley v. Valeo,* 424 U.S. 1, 14–15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1975); *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966).

 To the extent that the allegations of the present complaint are true, *see* pp. 1344–1349, *infra,* the defendants have clearly burdened the plaintiff candidates' rights of free political belief and expression. As noted above, impairment of a candidate's efforts to obtain public office can not, in itself, be equated with interference with protected first amendment freedoms. *Trafelet v. Thompson,* 594 F.2d 623, 632 (7th Cir.), *cert. denied,* —— U.S. ——, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979); *Newcomb v. Brennan,* 558 F.2d 825, 828 (7th Cir.), *cert. denied,* 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977); *see Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). Here, however, it is alleged that the defendants have intentionally used the power of the state to impede plaintiffs' candidacies because plaintiffs have chosen to run in opposition to the Democratic organization. Where state officials burden an individual's candidacy in order to discourage opposition to some more favored candidate or viewpoint, their actions constitute a punishment based on the content of a communicative act. *Newcomb v. Brennan,* 558 F.2d at 828.[16] As the court observed in *Newcomb,* "[p]laintiff's interest in running for . . . [public office] . . . and thereby expressing his political views without interference from state officials who wished to discourage the expressions of those views lies at the core of the values protected by the First Amendment." 558 F.2d at 829.

To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any

thought, free from government censorship. The essence of this forbidden censorship is content control. Any restriction on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."

. . . . .

[G]overnment must afford all points of view an equal opportunity to be heard. *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972) (citation omitted); *Collin v. Smith,* 578 F.2d 1197, 1202 (7th Cir.) (quoting *Mosley* ), *cert. denied,* 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978). "[T]he essence of the first amendment is its denial to government of the power to determine which message shall be heard and which suppressed. . . ." Karst, *Equality as a Central Principle in the First Amendment,* 43 U.Chi.L.Rev. 20, 28 (1975) (discussing *Mosley* ). "[A] concern about content . . . is never permitted." *Mosley,* 408 U.S. at 99, 92 S.Ct. at 2290 (citation omitted).

### 2. *Freedom of association*

[The Supreme Court's] decisions establish with unmistakable clarity that the freedom of an individual to associate for the purpose of advancing beliefs and ideas is protected by the First and Fourteenth Amendments. *E. g., Elrod v. Burns,* 427 U.S. 347, 355–357 [, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion)]; *Cousins v. Wigoda,* 419 U.S. 477, 487 [, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975)]; *Kusper v. Pontikes,* 414 U.S. 51, 56–57 [, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973)]; *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460–61 [, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)].

*Abood v. Detroit Board of Education,* 431 U.S. 209, 233, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977). The right of association is closely allied to freedom of speech and, like free

---

**16.** *Cf. Morial v. Judiciary Commission of Louisiana,* 565 F.2d 295, 301 (5th Cir. 1977) (*en banc* ), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978) (resign to run statute was not a penalty on the belief or expression of any particular idea).

speech, lies at the foundation of a free society. *Shelton v. Tucker,* 364 U.S. 479, 486, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Because "[E]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," *NAACP v. Alabama ex rel. Patterson,* 357 U.S. at 460, 78 S.Ct. at 1171, the first amendment guarantees the freedom to "associate with others for the common advancement of political beliefs and ideas . . . ." *Kusper v. Pontikes,* 414 U.S. 51, 56, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973). "The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom. *Williams v. Rhodes,* 393 U.S. 23, 30 [, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)]." *Kusper v. Pontikes,* 414 U.S. 51, 57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973).

In the present case, the defendants have burdened the rights of the plaintiff candidates and voters to associate. The Supreme Court has repeatedly stated that candidacy restrictions which have the effect of excluding certain candidates from the ballot burden the associational rights of those candidates and their supporters by rendering less valuable their freedom to collectively advance political ideas. *E. g., Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 188, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). In much the same way, when the state acts to oppose the electoral efforts of certain candidates on the ballot, it renders less valuable the associational rights of those candidates and their supporters.

### 3. *Equal participation in the electoral process*

There is no constitutional right to vote, as such. Nevertheless, the equal protection clause confers the substantive right to participate on an equal basis with other qualified voters whenever the state has adopted an electoral process for determining who will represent any segment of the state's population. *Lubin v. Panish,* 415 U.S. 709, 713–14, 94 S.Ct. 1315, 39 L.Ed.2d

702 (1974); *San Antonio School District v. Rodriguez,* 411 U.S. 1, 59 n.2, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring); *Kramer v. Union School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1968); *Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1971). "[E]ach and every citizen has an inalienable right to full and effective participation in the political process . . . ." *Reynolds v. Sims,* 377 U.S. 533, 565, 84 S.Ct. 1362, 1383, 12 L.Ed.2d 506 (1964). This right of qualified voters to cast their votes effectively is clearly fundamental. *E. g., Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 188, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Williams v. Rhodes,* 393 U.S. 23, 31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). Thus, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964). Since voters can only express their rights by voting for particular candidates, aspects of candidacy are "intertwined" with the rights of voters. *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974).

The allegations of the present complaint indicate that the defendants have interfered with the rights of the plaintiff voters to equal participation in the electoral process. *Shakman v. Democratic Organization of Cook County,* 435 F.2d 267, 270 (7th Cir. 1970), *cert. denied,* 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650 (1971). Equal electoral participation "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the exercise of the franchise." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964); *see* Karst, *Equality as a Central Principle in the First Amendment,* 43 U.Chi.L.Rev. 20, 57

(1975) ("the holding of *Reynolds v. Sims*, is that a state cannot constitutionally discriminate among voters by giving some interests greater proportional weight than is justified by the numbers of people who share those interests"). This principle frequently has been invoked in striking down legislative apportionment plans resulting in the numerical dilution of votes. While the complaint in this case does not present such a claim, it does involve allegations of similar types of inequality. The state is alleged to work against and make more difficult the election of certain candidates. To the extent this is true, *see* pp. 1345–1349 *infra,* the value of the votes of those supporting those candidates, in terms of their ability to affect the outcome of an election, is lessened.

## C. The Candidates' Interest in Freedom from Official Discrimination on the Basis of Their Political Beliefs—The Ballot Placement Cases

### 1. The two-part Bohus test

█ The analysis conducted in Section B, pp. 1331–1335 *supra,* demonstrates that if the allegations of the complaint are true, the patronage practices challenged in the complaint infringe the first and fourteenth amendment rights of the plaintiff candidates and voters. As noted above, it is helpful in considering the implications of this legal conclusion to carefully review those Supreme Court and Seventh Circuit cases which present factual settings closest to the present case. *Cf. Morial v. Judiciary Commission of Louisiana,* 565 F.2d 295, 304 (5th Cir. 1977) (en banc) (first and fourteenth amendment analytical approaches should both be applied, even though result will normally be the same), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978). In so doing, this court can have the benefit of the analytical framework used by higher courts in the most closely analogous setting.

Of all the cases dealing with the rights of candidates and voters, the line of cases that is most directly applicable to the facts of this case is the line of ballot placement cases. Ballot access cases, for example, usually allege the effectively complete exclusion of certain candidates or types of candidates from the ballot. Suffrage cases involve either the total exclusion of a class of voters from the electoral process or an identifiable dilution and debasement of their vote. Ballot placement cases, however, involve allegations of governmental interference with the equality of the electoral process in a manner and to a degree similar to that charged in the present case. In ballot placement cases, unlike ballot access cases, the government has not excluded any candidate or candidates from the electoral process. Instead, the government is charged, as in the present case, with acting so as to favor, to some relatively small degree, certain candidates because of their political affiliation.

█ In recent years, the Seventh Circuit has decided a clearly discernible line of ballot placement cases. *Board of Election Commissioners v. Libertarian Party,* 591 F.2d 22 (7th Cir.), *cert. denied* 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979); *Sangmeister v. Woodard,* 565 F.2d 460 (7th Cir.), *cert. denied,* 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535 (1977); *Baum v. Lunding,* 535 F.2d 1016 (7th Cir. 1976); *Bohus v. Board of Education,* 447 F.2d 821 (7th Cir. 1971); *Weisberg v. Powell,* 417 F.2d 388 (7th Cir. 1969) (per curiam). In these cases, the Seventh Circuit has analyzed the effect of various ballot placement schemes on voters' and candidates' interests in political expression, association, and equal participation in the electoral process. The consistent holding of these cases has been that "[a] successful challenge to ballot placement procedure under the equal protection clause requires a showing of 'an intentional or purposeful discrimination by authorities in which one class is favored over another.' *Bohus v. Board of Election Commissioners,* 447 F.2d at 822." *Board of Election Commissioners v. Libertarian Party,* 591 F.2d at 25.[17] In addition, the plaintiff must prove that the challenged election process "is an

17. *See Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

advantage in an election." *Board of Election Commissioners v. Libertarian Party,* 591 F.2d at 25 n.3 (citing *Bohus*); *Sangmeister v. Woodard,* 565 F.2d at 465 (citing *Bohus*); see *Baum v. Lunding,* 535 F.2d at 1018 (citing *Bohus*); *Weisberg v. Powell,* 417 F.2d at 392–93. *Cf. Smith v. Cherry,* 489 F.2d 1098, 1103 (7th Cir. 1973) (per curiam) ("relief under the equal protection clause is appropriate where, as here, plaintiffs have shown a discriminatory design favoring a particular group against others") (candidate substitution case), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974). The court adopts the standard of the *Bohus* case as the appropriate test in this case.

### 2. The degree of advantage required

The parties disagree as to the degree of advantage required by *Bohus.* The defendants present two arguments in support of their contention that the plaintiffs must satisfy a higher burden than the mere showing of "an advantage." First, they argue that the court of appeals' decision in this case requires that the plaintiffs show a "substantial, perhaps massive," 435 F.2d at 270, advantage in order to prove their case. Even if such a high standard is not necessary, they argue that the plaintiffs must at least demonstrate that the challenged patronage practices provide the defendants with a significant advantage, which they say the undisputed facts do not show here.

### a. A "substantial, perhaps massive" advantage is not required

The defendants' first argument is based on a slight misreading of certain language in the court of appeals decision. What the court of appeals actually said was:

The interest in an equal chance and an equal voice is allegedly impaired in the case before us by the misuse of official power over public employees so as to create *a substantial, perhaps massive, political effort* in favor of the ins and against the outs. We conclude that these interests are entitled to constitutional protection from injury of the nature alleged as well as from injury resulting from inequality in election procedure.

435 F.2d at 270 (emphasis added). This court does not construe the quoted language as requiring the plaintiffs to prove even a "substantial, perhaps massive, political effort" in order to prevail. Rather, the quoted language appears merely to be a characterization by the Seventh Circuit of the allegations of the plaintiffs' complaint.[18]

In any event, the defendants err when they claim that the plaintiffs must show a "substantial, perhaps massive," advantage accrues to the regular Democrats due to the defendants' patronage practices. Such a claim is erroneous, for neither the *Shakman* opinion nor any other authority supports their attempt to apply the quoted language to the degree of advantage required by *Bohus.*

---

**18.** Even if the plaintiffs are required to prove a "substantial, perhaps massive, political effort," they have done so here. The defendants' stipulations, see pp. 1324–1325 *supra,* show that many of the over twenty thousand patronage employees perform political precinct work. There are an average of four patronage employees for each precinct in the City, and there are other such employees in many precincts in the area of the County outside the City. The existence of a force of many thousands of employees for the purpose of helping regular Democrats win election over Independents shows, by itself, that the regular Democratic defendants make a "substantial, perhaps massive, political effort."

The defendants also argue that the plaintiffs must prove that the scope of the challenged patronage practices must be "substantial relative to the size of the electorate." This argument is based on language from the plurality opinion in *Elrod*: "Patronage thus tips the electoral process in favor of the incumbent party, and where the practice's scope is substantial relative to the size of the electorate, the impact on the process can be significant." *Elrod,* 427 U.S. at 356, 96 S.Ct. at 2681.

The court finds, however, that the crucial part of this passage is that which refers to tipping the electoral process in favor of the incumbent party. The Seventh Circuit cases have held, in effect, that that can be demonstrated by a showing that patronage is "an advantage," or "an actual, significant advantage" in elections. The scope of the patronage effort in relation to the size of the electorate can be probative of this fact, but proof of any particular ratio is not essential. It is sufficient that the advantage be proven by any appropriate means. *See* pp. 1337–1338 *infra.*

### b. *An actual, significant advantage is required*

 There is a legitimate argument, though, over the amount of the advantage that must be shown by the plaintiffs under the *Bohus* test. It is a general rule of constitutional law that heightened judicial scrutiny is not appropriate unless some significant effect has been felt on a protected interest. Unless there is more than a *de minimus* impact on the plaintiffs' interest in equal participation as candidates and voters in the electoral process, the plaintiffs cannot prove a constitutional violation, *see Duren v. Missouri,* 439 U.S. 357, 368, n.26, 99 S.Ct 664, 670 n.26 (1979) (dictim) (both purpose and effect are necessary to an equal protection violation); *Storer v. Brown,* 415 U.S. 724, 729, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974) ("substantial burdens on the right to vote or to associate for political purposes are constitutionally suspect") (primary affiliation case); *Kusper v. Pontikes,* 414 U.S. 51, 58, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973) (heightened scrutiny required when there is "a 'significant interference' with the exercise of the constitutionally protected right of free association") (citation omitted) (primary affiliation case); *Bullock v. Carter,* 405 U.S. 134, 143–44, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972) (strict scrutiny mandated where a restriction on the right to vote has a "real and appreciable impact on the exercise of the franchise") (filing fee case); *Socialist Workers Party v. March Fong Eu,* 591 F.2d 1252, 1260–61 & 1261 n.5 (9th Cir. 1978) ("more than insubstantial" burden required) (following *Storer*) (ballot identification case); *cert. denied,* 441 U.S. 946, 99 S.Ct. 2167, 60 L.Ed.2d 1049 (1979); *Antonio v. Kirkpatrick,* 579 F.2d 1147 (8th Cir. 1978) (following *Bullock*) (residency requirement case), and will not be entitled to relief, *see Mt. Healthy City School Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 270 n.21, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *cf. Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (scope of remedy is limited to the scope of the violation). Thus, this court must construe the "an advantage" test to require some showing that an actual, significant advantage is received by the favored candidates.

An early expression of this requirement can be found in the Seventh Circuit's decision in *Weisberg v. Powell,* 417 F.2d 388 (7th Cir. 1969). There, the court of appeals evaluated a similar contention by the defendants in a ballot placement case.

> Defendants contend that plaintiff failed to prove that a candidate with first or second ballot position would enjoy a substantial advantage. This amounts to an argument that the device employed by the secretary was ineffective; that the discrimination was harmless. We think it was adequately established that top position on the ballot is *one of a number of factors which tend to affect the outcome of an election, and which may have a substantial effect although the degree varies with the circumstances.*

417 F.2d at 392 (emphasis added). The *Weisberg* statement remains good law. *See Culliton v. Board of Election Commissioners,* 419 F.Supp. 126, 127–28 (N.D.Ill.1976) (quoting *Weisberg*), *aff'd sub nom. Sangmeister v. Woodard,* 565 F.2d 460, 465 (7th Cir.) (citing *Weisberg*), *cert. denied,* 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535 (1977). *See also Smith v. Cherry,* 489 F.2d 1098, 1102–03 (7th Cir. 1973) (per curiam), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974).

 Thus, the Seventh Circuit ballot placement cases show that the advantage need not be a massive or overwhelming one. It need not be the only, or the dominant factor in deciding elections. The plaintiffs, in order to prevail, must show no more than that the challenged patronage practices are a significant advantage, an advantage that will help the regular Democrats win some elections.

 The foregoing discussion of the ballot placement cases demonstrates that, even though there is no right to run for office, the rights of voters and candidates

discussed in Section B, pp. 1331–1335 *supra,* combine to give a candidate the right to be free from official discrimination on the basis of his or her political beliefs.[19] Those cases also provide a two-part test for determining whether this right has been violated. Once a plaintiff shows (1) an intentional discrimination by the government on the basis of his or her political beliefs that gives (2) an actual significant advantage in an election to his or her opponent, as defined in *Weisberg,* he or she has demonstrated an infringement of that right.

■■■ As in other first and fourteenth amendment cases, the defendants will then be obliged to demonstrate that the challenged law or practice can survive strict constitutional scrutiny, *i.e.,* that the challenged law or practice is necessary to the achievement of a compelling government interest. *See Board of Election Commissioners v. Libertarian Party,* 591 F.2d at 25; pp. 1349–1350 *infra.*[20] Without such a demonstration, the law or practice must be struck down as unconstitutional.

### D. The Bohus *Test is Consistent with General Theories of Fourteenth Amendment Motivation Analysis and with the* Shakman *Decision*

#### 1. General Theory

The preceding sections have analyzed a candidate's interest in running for office in the manner usually applied in such cases, and have identified a test that is applicable to the present case. The origins of the *Bohus* test, and its necessary applicability to the *Shakman* case, are not immediately

apparent. Closer investigation reveals that the *Bohus* test is in fact derived from general principles of fourteenth amendment equal protection analysis. *See Sangmeister v. Woodard,* 565 F.2d 460, 467 (7th Cir.) (*Bohus* test must be construed consistently with *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 [1976]), *cert. denied,* 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535 (1977).[21]

In recent years, the Supreme Court has decided several cases which discuss the scope of judicial review of improper legislative motivation under the equal protection clause of the fourteenth amendment. The most important of these cases, *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), disapproved several earlier cases which had held that courts could not review a legislative or administrative decision to determine whether the decision's motivation had been proper.[22] The *Davis* Court held that judicial review of motivation could be proper under certain circumstances. This position has been amplified by several subsequent Supreme Court decisions. *See Columbus Board of Education v. Penick,* —— U.S. ——, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Personnel Administrator v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

One commentator who has written extensively on the problems of motivation analysis is Professor John Hart Ely.[23] *See Ely, Legislative and Administrative Motivation in Constitutional Law,* 79 Yale L.J. 1207

---

**19.** Similarly, voters have a right not to have the campaigns of the candidates they support deliberately disadvantaged by official action. *See* pp. ——–—— *supra.*

**20.** *Cf. Barry v. District of Columbia Board of Elections,* 448 F.Supp. 1249, 1252 (D.D.C.1978) (absent discrimination against identifiable class, candidacy restriction is not subject to strict scrutiny) (resign to run statute), *appeal dismissed,* 188 U.S.App.D.C. 432, 580 F.2d 695 (D.C.Cir.1978).

**21.** *See also* notes 11, 12 *supra.*

**22.** *See Palmer v. Thompson,* 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

**23.** The other major contributor in this area has been Professor Paul Brest. *See* Brest, *Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motivation,* 1971 Sup.Ct.Rev. 95; Brest, *The Supreme Court, 1976 Term—Forward: In Defense of the Antidiscrimination Principle,* 90 Harv.L.Rev. 1 (1976). *See also, e. g.,* Symposium, *Legislative Motivation,* 15 San Diego L.Rev. 925 (1978).

(1970); Ely, *The Centrality and Limits of Motivation Analysis*, 15 San Diego L.Rev. 1155 (1978).[24] Professor Ely has made one point that is particularly helpful in understanding the theoretical basis of the *Bohus* and *Shakman* decisions.

> [Judicial] analysis of motivation is appropriate only to claims of improper discrimination in the distribution of goods that are constitutionally gratuitous (that is, benefits to which people are not entitled as a matter of substantive constitutional right). . . . However, *where what is denied is something to which the complainant has a substantive constitutional right*—either because it is granted by the terms of the Constitution, or because it is essential to the effective functioning of a democratic government—*the reasons it was denied are irrelevant.* . . . To have a right to something is to have a claim on it irrespective of why it is denied.

Ely, *Centrality and Limits*, 15 San Diego L.Rev. at 1160–61 (emphasis in original) (footnotes omitted) (citing Ely, *Legislative and Administrative Motivation*, 79 Yale L.J. at 1281–84).

■ Applying Professor Ely's insight to the *Shakman* and *Bohus* cases, the foundation for the Seventh Circuit's approach in this area becomes apparent. If a candidate has a right to candidacy, no special motivation scrutiny would be appropriate. Any government action that adversely burdened, affected, or impacted upon that candidacy would be subject to heightened judicial scrutiny. Without a right to candidacy, judicial review protects plaintiffs' candidacies, *per se*, only from those government decisions that are improperly motivated. Thus, it is entirely appropriate that a candidate can be protected from official discrimination against his or her candidacy because of his or her beliefs,[25] even though there is no right to candidacy.

■ The *Shakman* case, when read with the ballot placement cases, can therefore be seen as holding that government action that deliberately uses the patronage system to favor one candidate over another is improperly motivated for purposes of motivation analysis.[26] The *Shakman* decision is in accord with related Seventh Circuit decisions,

---

**24.** Ely's articles have been frequently cited by the Supreme Court for illumination of this area. *See Orr v. Orr*, 440 U.S. 268, 280 n.10, 99 S.Ct. 1102, 1112 n.10, 59 L.Ed.2d 306 (1979) (citing *Centrality and Limits*); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 n.18, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (citing *Legislative and Administrative Motivation*). *See also Personnel Administrator v. Feeney*, 442 U.S. 256, 283, 99 S.Ct. 2282, 2298, 60 L.Ed.2d 870 (1979) (Marshall, J., dissenting) (citing *Legislative and Administrative Motivation*); *Beer v. United States*, 425 U.S. 130, 148–49 n.4, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976) (Marshall, J., dissenting) (citing *Legislative and Administrative Motivation*); *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 262 n.20, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (citing *Legislative and Administrative Motivation*); *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 26 n.62, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (citing *Legislative and Administrative Motivation*); *Palmer v. Thompson*, 403 U.S. 217, 264, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971) (White, J., dissenting) (citing *Legislative and Administrative Motivation*).

**25.** The protected interest in being free from official discrimination against your candidacy can be stated, alternatively as an affirmative right: the right to equal participation in the process of running for office. *Cf. Morial v. Judiciary Commission of Louisiana*, 565 F.2d 295, 304 (5th Cir. 1977) (en banc) (discussing interrelationship of first and fourteenth amendment rights), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978). Whether it is analyzed in terms of improper discriminatory motivation, or as a violation of this affirmative right is irrelevant. Either way, the plaintiff needs to show (1) an improper government purpose, and (2) some actual discriminatory effect, that is, some actual advantage received by his or her opponents and not received by the plaintiff.

**26.** Or, to use synonymous analytical jargon, *Shakman* and the ballot placement cases hold that any classification based on political beliefs that is used to burden the attempt of particular groups to compete in the political process is suspect under the first amendment. *Accord, Trafelet v. Thompson*, 594 F.2d 623, 632 (7th Cir.) (dicta), *cert. denied,* —— U.S. ——, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979). Any legislative or administrative decision that embodies a suspect classification is subject to strict constitutional scrutiny. *See pp. 50 – 52 infra.*

*see Trafelet v. Thompson,* 594 F.2d 623, 632 (7th Cir.) (classifications burdening groups of voters because of their political beliefs require strict scrutiny) (dicta), *cert. denied,* —— U.S. ——, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979); *Board of Election Commissioners v. Libertarian Party,* 591 F.2d 22 (7th Cir.), *cert. denied,* 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979); *Sangmeister v. Woodard,* 565 F.2d 460 (7th Cir.), *cert. denied,* 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535 (1977); *Baum v. Lunding,* 535 F.2d 1016 (7th Cir. 1976); *Hennings v. Grafton,* 523 F.2d 861, 864 (7th Cir. 1975) (citing *Shakman*); *Smith v. Cherry,* 489 F.2d 1098, 1102–03 (7th Cir. 1973) (per curiam), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974); *Illinois State Employees Union v. Lewis,* 473 F.2d 561, 569 n.17 (7th Cir. 1972) (approving *Shakman*), *cert. denied,* 410 U.S. 928, 943, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); *Bohus v. Board of Education,* 447 F.2d 821 (7th Cir. 1971); *Briscoe v. Kusper,* 435 F.2d 1046, 1052 (7th Cir. 1970); *Weisberg v. Powell,* 417 F.2d 388 (7th Cir. 1969); *cf. United States v. Falk,* 479 F.2d 616, 620 (7th Cir. 1973) (en banc) (government is forbidden to discriminate on the basis of the exercise of protected first amendment activities);[27] and is not inconsistent with applicable Supreme Court decisions, *Buckley v. Valeo,* 424 U.S. 1, 96, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (government assistance to political campaigns must not give unfair advantages); *Police Department of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1973); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *cf. Abood v. Detroit Board of Education,* 431 U.S. 209, 234–35, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (freedom to believe as one will and not have belief forced upon you by the government is at the heart of the first amendment). *See generally,* pp. 1331–1339; note 9 *supra.* Interpreted in this fashion, the Seventh Circuit's opinion in *Shakman* is seen to be in general accord with current law.

It is clear that at least some aspects of the interests of candidates in an equal chance and of the interests of voters in having an equally effective voice are rights secured from state action by the equal protection clause of the fourteenth amendment.

The interests of candidates in official treatment free from intentional or purposeful discrimination are entitled to constitutional protection.

. . . The equal protection clause secures from invidious official discrimination the voter's [and the candidate's] interest in a voice in government of equal effectiveness with other voters.

. . . The interest in an equal chance and an equal voice is allegedly impaired in the case before us by the misuse of official power over public employees so as to create a substantial, perhaps, massive, political effort in favor of the ins and against the outs. We conclude that these interests are entitled to constitutional protection from injury of the nature alleged as well as from injury resulting from inequality in election procedure.

435 F.2d at 270.

2. *A showing of coercion is not required by the* Shakman *decision.*

There is one possible difference in theory between the Seventh Circuit's *Shakman* opinion and the later case law discussed above. In the *Shakman* decision, the court of appeals may have assumed that proof that the patronage employees' political activity was coerced was a necessary part of the plaintiffs' case.

One may foresee that in the areas of proof, and devising relief if the claims be proved, care will be required in order to distinguish between compelled and voluntary political support by public employees. Except to the extent some statute validly restricts political expression or activity by public employees, such individuals enjoy the same right of political association and expression on their own time, as anyone else.

---

**27.** *See also Rhode Island Minority Caucus v. Baronian,* 590 F.2d 372, 376 (1st Cir. 1979) ("privilege of holding public employment . . . may not be denied by the state on the basis of distinctions which violate federal constitutional guarantees").

435 F.2d at 271. Judge Marovitz's ruling on the motions to dismiss of the defendants who did not join the consent decree did make this assumption. *See* note 3 *supra.* Based on these decisions, defendants argue that the plaintiffs must show that their rights have been infringed by coerced precinct work.

 The recent Supreme Court and Seventh Circuit case law necessarily implies that proof of coercion is not an essential part of the plaintiffs' case. If independent candidates and voters have a protected constitutional entitlement to freedom from official discrimination against their candidacies and votes on the basis of their political beliefs, that right will be violated by any scheme of patronage employment that uses government jobs to elect government supported candidates. Whether the political precinct work done by the patronage workers is coerced becomes irrelevant for the purpose of proving the violation.[28] The plaintiffs need only show that the government, in sponsoring the patronage system, is purposefully discriminating against them on the basis of their political beliefs, and that the system provides regular Democrats with "an advantage" in elections[29] that they would not otherwise have, *see* pp. 1335–1338 *supra*; pp. 1346–1347; note 38 *infra.*

## IV. THE CHALLENGED PATRONAGE PRACTICES INFRINGE UPON THE PLAINTIFFS' FIRST AND FOURTEENTH AMENDMENT INTERESTS

██ The patronage practices challenged in this case infringe upon the plaintiffs'

first and fourteenth amendment interests, for the stipulated admissions made by the defendants satisfy the two-part *Bohus* test. The court's decision evaluates the factual matter in the light of two legal standards which govern its organization of the facts.

### A. The Legal Standards Applied in Interpreting the Facts

#### 1. The standard for summary judgment

Both sides have attempted to avoid a trial in this case by stipulating to facts which each party hoped would be sufficient for a grant of summary judgment in its favor. The court recognizes that to find for either party on a motion for summary judgment, the court must determine that a high burden of proof has been met.

The party moving for summary judgment has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in his favor. The issue of material fact required to be present need not [, however,] be resolved conclusively in favor of the party asserting its existence, but the movant need only show that sufficient evidence supporting the claimed factual dispute does not require a jury or judge at trial to resolve the parties' differing versions of truth. All inferences to be drawn from the facts contained in the affidavits, exhibits, and depositions are to be drawn in favor of the non-movant. *Adikes v. S. H. Kress & Co.*, 398 U.S. 144, 153, 159–61, 90 S.Ct. 1598, 26 L.Ed.2d 142 [(1970)]; *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 303,

---

**28.** The question of whether precinct work is coerced will remain relevant in the creation of a remedy. The court would not prevent current patronage employees from continuing to do voluntary, uncompelled precinct work. Similarly, it would not prohibit the defendants from hiring any individual who has done precinct work on their behalf in the past. It would be appropriate, however, to bar the defendants from ever including consideration of an individual's past history of precinct work, or the lack thereof, in any employment decision. *See Illinois State Employees Union v. Lewis*, 473 F.2d

561, 567–68 (7th Cir. 1972) *cert. denied*, 410 U.S. 928, 943, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). *Cf. United Public Workers v. Mitchell*, 330 U.S. 75, 96, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (Congress cannot pass law barring Republicans from public jobs). *See also* pp. 1345–1349 *infra.*

**29.** Thus, the Seventh Circuit's determination in *Shakman* that coercion is relevant is not binding on this court as the law of the case. *See* note 6 *supra.*

305–07, 88 S.Ct. 1575, 20 L.Ed.2d 569 [(1968)]; *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 468–69, 82 S.Ct. 486, 7 L.Ed.2d 458 [(1962)].

*Cedillo v. International Association of Bridge Workers,* 603 F.2d 7, 10, (7th Cir. 1979).[30]

Even though the standard for granting a summary judgment is high, a court must not shrink from granting a summary judgment where it is appropriate.

With the ever increasing burden upon the judiciary, persuasive reasons exist for the utilization of summary judgment procedure wherever appropriate. Therefore, while appellate courts should not look the other way to ignore the existence of genuine issues of material fact, on the other hand we do not deem it necessary in the best interest of judicial administration to strain to find the existence of such genuine issues where none exist.

*Kirk v. Home Indemnity Co.,* 431 F.2d 554, 560 (7th Cir. 1970).

### 2. *Conspiracy liability*

Taken together, the admissions of the defendants, when combined with the uncontroverted affidavits of the plaintiffs, establish that if the patronage practices of the defendants were unconstitutional, the defendants were engaged in a civil conspiracy to commit them. The law of civil conspiracy was recently restated by the Seventh Circuit in *Hampton v. Hanrahan,* 600 F.2d 600, 620–25 (7th Cir. 1979).

A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another, and an overt act that results in damage.'" *Rotermund v. United States Steel Corp.,* 474 F.2d 1139 (8th Cir. 1973) (citation omitted). In order to prove the existence of a civil conspiracy, a plaintiff is not required to provide direct evidence of the agreement between the conspirators; "[c]ircumstantial evidence may provide adequate proof of conspiracy." *Hoffman-La Roche, Inc. v. Greenberg,* 447 F.2d 872, 875 (7th Cir. 1971). [600 F.2d at 620–21].

⋅ ⋅ ⋅ ⋅ ⋅

A plaintiff seeking redress need not prove that each participant in a conspiracy knew the "exact limits of the illegal plan or the identity of all participants therein." *Hoffman-La Roche, Inc.,* supra, 447 F.2d at 875. An express agreement among all the conspirators is not a necessary element of a civil conspiracy. The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result. [600 F.2d at 621.]

⋅ ⋅ ⋅ ⋅

⋅ ⋅ ⋅ [I]n order to have an adequate claim for relief under section 1983, a plaintiff must allege and prove both a conspiracy and an actual deprivation of rights; mere proof of a conspiracy is insufficient to establish a section 1983 claim. [600 F.2d at 622.]

⋅ ⋅ ⋅ ⋅ ⋅

22 Discrimination on the basis of political beliefs or affiliations has been found to be actionable under section 1985(3). [600 F.2d at 623 n.22.]

▮ The stipulated admissions of the defendants, together with the other evidentiary matter before the court, establishes that there was a conspiracy among the defendants to deprive the plaintiffs of the rights discussed in Part III, p. 1329–1341 supra. Sheriff Elrod's stipulations indicate the scope of the conspiracy. He admitted that there is a regular practice among the defendants of using public employment for

---

**30.** The court of appeals continued: "Finally, as a general principle, questions of motive and intent are particularly inappropriate for summary adjudication." *Cedillo,* at 11. This is a rare case where a question of motive and intent is conceded by the defendants, making summary adjudication proper.

political purposes. As stated on page 4 of his stipulation:

8. When elected Sheriff, Mr. Elrod had known of the practice in Chicago, Cook County and the State of Illinois whereby public employment positions with the City government and with other governmental offices in Cook County and the State of Illinois had often been filled on the basis of political recommendation, as discussed below . . . . Mr. Elrod had also known of the then practice whereby some public employees of the City government and of other governmental offices in Cook County and the State of Illinois who failed to do adequate precinct work or financially to support their ward organizations had been discharged from public employment. Similarly, he had known of a practice in the State of Illinois whereby when a new office holder takes office and is of a different political party or persuasion than his predecessor, many of the employees in the governmental office of the same political affiliation or persuasion as the predecessor are discharged, so that persons may be hired who have been politically recommended by the party of the new office holder. [Footnote omitted.]

The Sheriff's other admissions are typical of those made by all the defendants, although his language is unusually frank. As stated on pages 15–16 of his stipulation:

30. Members of the regular Democratic organization generally recommend persons for employment by various governmental offices such as the Sheriff's Office on the basis, among other considerations, of their support or promise of support of the regular Cook County Democratic Organization, of the recommender's ward or township organization or of other units of the Democratic Party and for candidates endorsed thereby. Many such persons are required as a condition of obtaining a recommendation for public employment, to do or to promise to do precinct or other political work for the candidates endorsed by the local regular Democratic Ward Organization or to make or to promise financial contribu-

tions to that ward organization. This is a *practice* of long standing in Cook County. Sheriff Elrod has been aware of these practices since prior to December 7, 1970. [Emphasis added.]

31. Usually no person is recommended by a member of the regular Democratic organization for a public employment position if he or she has in any open way been a worker or partisan of any political group opposed to or by the regular Cook County Democratic Organization and the Central Committee or subunits thereof. On some occasions such persons are so recommended if they agree to switch political affiliation and agree to support the regular Democratic organization and its candidates. Defendant Elrod has also been aware of these practices since prior to December 7, 1970.

32. With regard to applicants for Sheriff's non-merit positions recommended by Central Committee members or other persons active in regular Democratic politics, the political recommendation has frequently been communicated by the recommender to Sheriff Elrod by means of a letter. . . . In some instances prospective employees for Sheriff's non-merit positions have had the fact of such political recommendation by members of the Central Committee or other important political persons or elected officials in the regular Democratic organization communicated to Sheriff Elrod by a phone call or a personal oral conversation rather than by letter.

The stipulations and admissions of the other consenting and non-consenting defendants are generally similar. They demonstrate that all defendants understand the nature of and participated in this "practice," which can be characterized in technical language as a "common plan."

All of the defendants in question have admitted that they are aware that members of the Democratic Central Committee regularly sponsor applicants for employment to the defendant government officials' agencies. They have also admitted that they are

aware that those sponsored are often required to perform or to promise to perform political work in exchange for appointments to jobs. Finally, the defendants admitted that the officeholders appoint these patronage workers to jobs with the expectation that they will do the precinct work and help elect Democratic candidates. In addition to those admissions, the plaintiff has submitted affidavits that show that it is the policy of the defendants to act together to create and further this patronage system.

The defendants have produced no evidentiary matter to refute the material submitted by the plaintiffs.[31] The court can only conclude, see Rule 56(e), Fed.R.Civ.P., that there is no genuine issue as to any material fact concerning the existence of a common plan among the defendants to implement and effectuate the challenged patronage practices, see Hampton, 600 F.2d at 621; Hoffman-La Roche, Inc. v. Greenberg, 447 F.2d 872, 875 (7th Cir. 1971). To the extent that those practices illegally affect the plaintiffs' rights, see pp. 1331–1341 supra, and pp. 1344–1349 infra, each defendant is a member of a conspiracy violative of 42 U.S.C. §§ 1983, 1985, see Hampton v. Hanrahan, 600 F.2d at 622–25, and each is responsible for the acts, see, e.g., Hostrop v. Board of Junior College District No. 515, 523 F.2d 569, 576 (7th Cir. 1975), cert. denied, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976); Scott v. Moore, 461 F.Supp. 224, 228 (E.D.Tex.1978), and admissions, see, e.g., United States v. Trowery, 542 F.2d 623, 626–27 (3d Cir. 1976) (dicta) (admissions admissible as evidence against co-conspirator after the court determines that the conspiracy existed at the time of the admission), cert. denied, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977), of its co-conspirators, conducted during the pendency of the conspiracy and in furtherance thereof.[32]

The liability of each defendant for all challenged practices is not absolute. In this case, the consenting defendants have renounced, through the consent decree, the use of patronage firing and promotion practices. The plaintiffs have tendered no evidence to suggest that the consenting defendants condone the non-consenting defendants' continued refusal to abjure such practices. Thus, the consenting defendants are not responsible for those practices.

Therefore, in analyzing the constitutionality of the challenged practices, each defendant will be accountable for the hiring practices of all the defendants currently before the court. In addition, the nonconsenting defendants will also be held accountable for their own and each other's patronage firing and promotion practices.

### B. The Plaintiffs Have Proved Both Parts of the Bohus Test

#### 1. The illegitimate purpose is conceded

The first part of the Bohus test is not even arguable in this case. The defendants have freely admitted that "one of the purposes of giving the preference in hiring" is to "help . . . elect candidates supported by the various members of the Democratic County Central Committee." This necessarily involves a deliberate discrimination against the plaintiff candidates and

31. The absence of additional direct evidence as to meeting dates, particular acts, etc., demonstrating the creation of the conspiracy is not dispositive. Circumstantial evidence may provide adequate proof of the existence of the conspiracy. Hampton, 600 F.2d at 621; Hoffman-La Roche, 447 F.2d at 872.

32. The conspiracy allegations of Counts IV, V, and VI are broad. Under recently developed Seventh Circuit law, they might have had difficulty withstanding a motion to dismiss. Compare Sparkmun v. McFarlin, 601 F.2d 261, 268 (7th Cir. 1979) (en banc) (plurality opinion of Judge Sprecher) (dismissing complaint for insufficiently specific pleading of conspiracy with immune state court judge), with id., at 274–81, (Swygert, J., dissenting) (emphasizing the limited nature of the plurality's holding) (discussing proof of civil conspiracy). Since the factual record before the court contains sufficient uncontroverted evidence to prove the conspiracy, as discussed in the text, and the defendants have not objected to the sufficiency of the pleadings or the court's consideration of the evidence, any inadequacy that may have existed has been waived, see Rule 15(b), Fed.R. Civ.P., and the court may proceed to grant summary judgment. See 3 Moore's Federal Practice, ¶ 15.13[2] (2d ed. 1979) (collecting cases).

voters who, as independents, normally oppose the regular Democratic organization candidates. There is therefore no question of material fact as to the existence of "an intentional or purposeful discrimination by authorities in which one class is favored over another." *See* p. 28 *supra.*[33]

### 2. The Challenged Patronage Practices Give the Defendants an Advantage in Elections

The court also concludes that there is no genuine issue of material fact concerning the question of whether the challenged patronage practices give the defendants an actual, significant advantage in elections. Based on the stipulated admissions of the parties, the court can only conclude that the plaintiffs have demonstrated the existence of such an advantage.

#### a. The consenting defendants

The defendant Democratic County Central Committee for Cook County made, *inter alia*, the following admissions with respect to the claims made against each of the consenting defendants:

> [Agency name] gives preference in hiring for many [Agency] jobs to persons who are politically sponsored by Democratic Party Ward or township committeemen or other Democratic regular organization officials. For some of these jobs persons normally can be hired only with Democratic political sponsorship. Most of the jobs for which preference is given are not policy-making or confidential in nature. [Agency] employees often inform Party officials of job openings of which public notice is not otherwise given.

> The [Agency] has approximately [number] employees. Over [fraction] of the people hired by the [Agency] in recent years were for jobs for which preference was given to applicants with Democratic Party sponsorship.

> . . . . . .

> Usually persons get the sponsorship for a County job from a Democratic party official either after having done or upon the expectation that they will do precinct political work (such as door to door canvassing, putting up posters, etc.) on behalf of candidates for public office endorsed by the sponsor.

> In the City of Chicago there are, on the average, over 250 persons per ward who were sponsored by the Democratic Party officials for state, Cook County, Cook County officer, City of Chicago and other public jobs. There are likewise significant numbers of persons so sponsored for public jobs in the various townships in Cook County. A significant number of these persons in the City and County do political precinct work on behalf of candidates for office supported by sponsoring Democratic Party officials. This political precinct work helps elect candidates supported by the various members of the Democratic County Central Committee. This is one of the purposes of giving the preference in hiring.

Similar admissions are made by the other consenting defendants.

Taking all inferences in favor of the defendant, the next-to-last sentence necessari-

---

**33.** It is not relevant that the defendants do not admit that helping elect regular Democratic candidates is the only purpose for their patronage hiring practices. Under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270 n.21, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Mt. Healthy City School Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), a decision is presumed to be improperly motivated once the plaintiffs show that an improper motivation was present. The defendants may rebut that presumption by showing that legitimate purposes support the decision, and that the same decision would have resulted absent the impermissible purpose. *See* Comment, *Proof of Racially Discriminatory Purpose Under the Equal Protection Clause*: Washington v. Davis, Arlington Heights, Mt. Healthy, *and* Williamsburgh, 12 Harv.C.R.–C.L. L. Rev. 725 (1977). *See also Finkel v. Branti*, 598 F.2d 609, No. 78-7494 (2d Cir. Feb. 20) (unpublished order) (discussing *Mt. Healthy*), *cert. granted*, —— U.S. ——, 99 S.Ct. 3095, 61 L.Ed.2d 871 (1979).

The defendants in this case have never claimed that the challenged patronage practices would be carried out in the same way if they did not help elect Democrats. Nothing in the record would support such a claim.

ly shows that the political precinct work done by sponsored patronage workers provides the regular Democratic defendants with an actual, significant advantage in elections.[34] It would go against the plain language of the admission to accept any inference that even though precinct work helps elect regular Democrats, that help is only insubstantial or *de minimus*.[35] The admission is unqualified and unequivocal. The court can only construe it as identifying exactly the type of factor to which the *Weisberg* court referred when it held that the ballot placement practice challenged in that case was "one of a number of factors which tend to affect the outcome of an election, and which may have a substantial effect although the degree varies with the circumstances." *Weisberg v. Powell*, 417 F.2d 388, 392 (7th Cir. 1969).[36]

The only way that the consenting defendants could avoid summary judgment on this issue would be by showing that the challenged patronage hiring practices are somehow not responsible for the patronage work done by patronage workers. If the precinct work would be done absent the patronage system, or more specifically, if sponsored patronage employees were people who would do precinct political work even if they did not have patronage jobs and had no prospect of or interest in getting them, then it could not be said that the challenged patronage hiring practices provide "an advantage" in elections. Thus, the defendants have made some arguments in the briefs that attempt to raise a genuine issue

| Raby (I) | 14,145 |
| Nicholson (D) | 12,330 |
| Shakman (I) | 11,707 |
| McGee (D) | 9,205 |

Plaintiff Shakman lost his campaign for election as a delegate to the Constitutional Convention by only 623 votes. Although the exact number of patronage workers in the district is not before the court, it is clear that a small number of patronage workers, if they have any effectiveness at all, could help swing this and other close elections. And it is clear that they do have some effectiveness, for the defendants have stipulated that patronage precinct workers "help elect" Democratic candidates.

The defendants note that the plaintiff is white while the other three candidates were blacks. They suggest that that may be the most important factor for Mr. Shakman's defeat in this predominantly black district. That argument does not refute Mr. Shakman's point, however. The effect of the defendants' patronage practices may well have been a dispositive factor in the election, that is, a but-for cause of the result, even if it was not the most important factor.

Similarly, it is not important that the regular Democrats do not win all elections in Chicago or Cook County. The Court of Appeals for the Seventh Circuit has interpreted the Constitution and applicable Supreme Court precedent as prohibiting any government action significantly favoring one party or political belief over another unless the action is necessary to further a compelling state interest. As long as the plaintiffs can prove, as they have in this case, that the challenged conduct constitutes an advantage that may give the regular Democrats more elections than they would otherwise win, they have made out their claim.

---

34. Note that since the patronage employees of any one officeholder are expected to work to support the candidates of the entire regular Democratic ticket, it is the ticketwide effect of the defendant conspirators that must be studied. The fact, for example, that Sheriff Elrod's predecessors in the last two dozen years have included two Republicans and an Independent, see *Elrod*, 427 U.S. at 382 n.5, 96 S.Ct. 2673 (Powell, J., dissenting), does not decrease the unconstitutional impact of the Sheriff's office's patronage practices on the entire electoral process of Cook County.

35. Subsequent to the stipulated admissions made by the defendants, they filed affidavits containing expert testimony denying the existence of any significant advantage. See Memorandum of Non-Consenting Defendants in Opposition to Plaintiffs' Motion for Partial Summary Judgment, at 11. These affidavits cannot override the admissions, for the admissions made by the defendants are binding upon them, and the defendants have not sought to withdraw the admissions. Any evidence inconsistent with the stipulated admissions cannot be considered by the court. Rule 36(b), Fed.R. Civ.P.; see 8 C. Wright & A. Miller, Federal Practice and Procedure, § 2264.

36. The results of two campaigns are illustrative. In one, defendant Elrod only won by 10,500 votes in his 1970 race for sheriff against Bernard Carey. That total is smaller than the admitted number of regular Democratic patronage employees in Cook County.

The other campaign is the one which led to this lawsuit. The plaintiff Shakman ran with Al Raby as independents. Odas Nicholson and Attye Belle McGee ran as regular Democrats. The results were:

as to whether a significant number of those patronage workers who do precinct work perform that work voluntarily. They have also submitted excerpts from depositions of several patronage workers, apparently taken in connection with earlier compliance hearings in this case, in which the workers claim that certain precinct work they had performed was done voluntarily.

 The court holds that the matter submitted by the defendants is not, however, sufficient to create a genuine issue of material fact. Although the defendants have submitted evidence that indicates that some patronage employees do work on a voluntary basis after they obtain their jobs, they have not submitted evidence in any form that any patronage employee who does political precinct work would voluntarily do the same work even if he did not have, and could never obtain, a patronage job. Since the consenting defendants' responses do not "set forth specific facts showing that there is a genuine issue for trial," summary judgment is properly entered against them.[37] Rule 56(e), Fed.R. Civ.P. *See, e.g., Faulkner v. Baldwin Piano & Organ Co.,* 561 F.2d 677, 682–83 (7th Cir. 1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978).[38]

---

**37.** The plaintiff has presented enough evidence to warrant summary judgment on this question. The admission that persons usually get sponsorship in exchange for past services or a promise of future services is particularly strong evidence on this point.

**38.** The above argument is based on the assumption that it is not necessary for the plaintiff to prove that all of the precinct work done by sponsored employees is coerced. If the court's legal analysis is incorrect, and proof of coerced work is held to be part of the plaintiff's case, the stipulated admissions of the parties may still be sufficient to demonstrate the requisite coercion. The admissions can be said to prove the following:

1. The challenged patronage hiring practices are massive in scope, and involve a large percentage of the total number of civilian, non-teacher government jobs available in Cook County.
2. Notice of vacancies for the patronage jobs is often available only through regular Democratic committeemen.
3. Sponsorship is usually granted in exchange for past political work [and]/or for a promise of future political work. (The court notes that "usually" is defined as "[i]n a usual or wonted manner; according to customary, established or frequent usage; commonly, customary, ordinarily; as a rule. Oxford English Dictionary at 477 [1933 ed.]. *See* The American Heritage Dictionary of the English Language, at 1410.) Though there may be occasional exceptions, sponsorship is customarily, as a rule, conditioned on the performance of precinct work.
4. Precinct work that is so conditioned, as against the background of the evidence in general, and 1 and 2 in particular, is necessarily coerced.
5. The political precinct work of sponsored patronage employees helps win elections.
6. This provides an actual, significant advantage in elections.

The weak point of this argument is that it is conceivable that a substantial number of those patronage employees who received their job in exchange for prior services may subsequently work for the regular Democratic organization either "voluntarily" in gratitude for their job or because they like the boss and the candidates he supports. (The services of those who received their job in exchange for future political services is presumptively coerced, even though the consent decree in this case makes their promises unenforceable.) The number of such "voluntary" workers might be so substantial that the court could not say that the "advantage" received by regular Democrats because of the precinct work was a direct result of the coerced precinct work. As noted in the text, certain deposition excerpts were proffered to support such a claim, although the excerpts do not indicate the consideration for which the deponents received their job.

Summary judgment might still be appropriate, however. The admission made by the defendants only focuses on the post-employment precinct work of these employees. A considerable amount of pre-employment work must continually and necessarily be performed by prospective applicants who will use that work to obtain government jobs. The admissions of the defendants logically compel that this work, too, be considered in determining whether enough of the precinct work that "helps elect" regular Democrats is coerced work, for purposes of granting summary judgment.

It is possible that a court might decide that the resolution of this issue could only be done by a trial on the merits, at which general testimony on the scope and effect of coerced patronage work would be taken, as limited by the stipulations. On the other hand, a court might well conclude, as this court does, that no genuine issue of material fact really exists here, and that a court that refuses to grant summary

### b. *The non-consenting defendants*

█ Since the court holds that there is no genuine issue of material fact between the plaintiffs and the consenting defendants, it must hold, *a fortiori*, that there is no genuine issue of material fact between the plaintiffs and the non-consenting defendants. The non-consenting defendants, as members of the same conspiracy as the consenting defendants, are responsible for the acts and admissions of the consenting defendants that were taken within the scope of the conspiracy and in furtherance thereof. *See* p. 1344 *supra.* That alone is sufficient to justify a finding that the non-consenting defendants have not

raised a genuine issue of material fact as to whether their practices, when combined with those of the consenting defendants, infringe upon the plaintiffs' protected first and fourteenth amendment rights.

In addition, the non-consenting defendants are responsible for the effects upon the electoral process of their own patronage promotion and firing practices. There can be no doubt that these practices are far more coercive upon current employees than are the consenting defendants' patronage hiring practices, and they are far more likely than the hiring practices to cause current employees to do precinct political work.[39]

judgment to the plaintiffs is straining hard to avoid it. *See* p. 1342 *supra.*

**39.** The court sees no point in conducting a detailed explication of the evidence concerning the non-consenting defendants' firing and promotion practices. Much of the evidence is summarized in the unpublished Supplemental Findings of Fact issued today. The following stipulated admissions, however, are of particular interest to the court because they, when read together, highlight some of the evidence regarding those practices.

29. No employee of the Park District hired for full-time work under a temporary appointment and whose work at the Park District has been deemed satisfactory has been discharged in the last three years because of the expiration of the temporary appointment. Persons hired by the Park District under temporary appointments frequently remain for extended periods of time as "temporary appointments." Persons who are performing satisfactory work, have satisfactory efficiency ratings and who are not discharged for other reasons and who do not obtain civil service status, are reappointed as temporary appointments. From time to time persons hired under temporary appointments pass civil service examinations and thus secure protected civil service status. By virtue of actual job experience gained as an employee of the Park District under a temporary appointment, persons obtain an advantage on civil service examinations over persons not so employed.

30. Many promotions in full-time (other than summer) employment are into temporary appointment positions. . . . Preference is given, in many instances, in promotions under temporary appointments in positions which are not policy-making or confidential in nature to persons with political sponsorship as described above, but such preference is only given to employees who the Park District finds to be fit and qualified

for the position to which the promotion is being made.

. . . . .

32. The Superintendent and the Personnel Director from time to time receive telephone calls or other communications from Central Committee members asking that Park District employees be fired because of their failure to do satisfactory political precinct work, but the Park District's position is that the Superintendent has not, in fact, done so.

33. In response to requests of the kind referred to in Paragraph 30 above, the Park District from time to time transfers the employee to employment out of the ward of the sponsor if, in the judgment of the Superintendent and the immediate Supervisor of the employee, it is in the best interest of the Park District.

34. From time to time the Superintendent and the Personnel Director receive telephone calls or other oral communications from Central Committee members asking that Park District employees who are having employment difficulties with the Park District not be discharged, sometimes citing their good political standing. In some instances, consideration is given to these communications in giving these employees an opportunity to improve their work performance rather than being immediately discharged.

35. It is believed that the Park District on occasion, in the past, discharged employees upon the recommendation of the employee's political sponsor, usually because of a failure to do adequate political precinct work. It is the position of the Park District that since Mr. Kelly became its General Superintendent, the Park District has not followed such a practice of discharging employees. Mr. Kelly has no personal knowledge of such a practice while he has been employed by the Park District.

36. The Park District maintains a list of its employees by Parks, and it maintains rec-

The additional effect of this coerced precinct work, when added to the effect of the work produced by the patronage hiring practices of the consenting defendants, creates an even greater infringement on the plaintiffs' right to an electoral process that is not tainted by deliberate discrimination against their political efforts.

The non-consenting defendants claim that even though at one point they may have been liable for their patronage firing practices, they should not now be held responsible for them. This claim is based on two separate arguments. First, the defendants say that they have not conducted any patronage firings in recent years. Second, they argue that since the Supreme Court's decision in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), has effectively outlawed patronage firing practices, this court need not rule on those practices.

Both arguments are insufficient. As to the first, the defendants have never renounced, with legal sufficiency, the use of their patronage firing powers. Absent such a renunciation, the plaintiffs' claim on this ground is not mooted.

It is established doctrine that the voluntary cessation of the complained action is not sufficient to moot litigation. It must appear with assurance "that 'there is no responsible expectation that the wrong will be repeated,'" [citation omitted]. The defendants have the "heavy burden of persuasion." (citation omitted).

*Hernandez v. Finley*, 471 F.Supp. 516, 521 (N.D.Ill.1978) (three-judge court) (quoting *Rabinowitz v. Board of College District No. 508*, 507 F.2d 1255, 1256 [7th Cir. 1974]).

As to the second argument, the plaintiffs' claim against the defendants' firing practices is legally distinct from the claim brought by the fired patronage employee in *Elrod v. Burns. See* pp. 1327–1329 *supra.* The non-consenting defendants have cited no cases that would suggest that the plaintiffs here are not entitled to a legal determination of their own claim, so that they may obtain direct enforcement from this court of any violation of their own rights that may occur.

The court therefore holds that the non-consenting defendants have independently infringed the plaintiffs' constitutional rights through their use of patronage hiring, firing, and promotion practices, as well as through their conspiracy with the consenting defendants to practice and further patronage hiring practices.[40]

## V. NO COMPELLING GOVERNMENT INTEREST IS NECESSARILY FURTHERED BY THE CHALLENGED PATRONAGE PRACTICES

### A. *The Legal Standard*

Whether analyzed under the first or the fourteenth amendment, the challenged patronage practices must survive exacting scrutiny. Under the first amendment, significant government inter-

---

ords of the parks in each ward. The records of the Park District thus reflect the ward of residence of Park District employees. These records on occasion are used to respond to requests from Central Committee members for additional jobs for politically worthy persons from the ward.

. . . . .

38. One of the reasons for giving preference in hiring, as stated above, is to assist in providing regular Democratic political precinct organizations.
Stipulations of Fact Between Plaintiffs and Defendant, Chicago Park District, at 11–14. Certain of defendant Elrod's stipulations are quoted at pp. 1342–1343 *supra.*

**40.** In its analysis in sections a and b, pp. 1345–1349 *supra*, the court has evaluated the factual

record to determine whether it leaves no genuine issue of material fact as against the legal standard set by the *Bohus* test. The court could also conduct a second analysis performing a detailed review of the evidence under the "traditional" first and fourteenth amendment legal approach, *see* pp. 1331–1335 *supra.* The court has not considered the second factual analysis to be necessary, since it should be apparent from the factual discussion conducted in connection with the *Bohus* test that the defendants' challenged practices substantially infringe the plaintiffs' rights of political expression, association, and equal participation of voters in the electoral process. Under either approach, the facts justify the application of the strict scrutiny test to the patronage practices.

ferences with the freedom of speech, political belief, expression, or association, must survive exacting scrutiny. *Abood v. Detroit Board of Education*, 431 U.S. 209, 259–60, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (Powell, J., concurring in the judgment); *Elrod v. Burns*, 424 U.S. 347, 362–63, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); *id.*, at 381, 96 S.Ct. at 2693 (Powell, J., dissenting); *Buckley v. Valeo*, 424 U.S. 1, 25, 64, 96 S.Ct. 612, 46 L.Ed.2d 659 (1975). This is true whether the challenged action directly restricts first amendment freedoms or places indirect burdens on their exercise, so long as the government provides some inducement for their abandonment. *Elrod*, 427 U.S. at 356–61, 96 S.Ct. 2673 (plurality opinion); *see Kusper v. Pontikes*, 414 U.S. 51, 58, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973). Such interferences cannot be justified by a mere showing of a rational relation to a legitimate government objective. *Elrod*, 427 U.S. at 362, 96 S.Ct. 2673 (plurality opinion) *id.*, at 381, 96 S.Ct. 2673 (Powell, J., dissenting); *Buckley*, 424 U.S. at 64, 96 S.Ct. 612; *Rhode Island Minority Caucus v. Baronian*, 590 F.2d 372, 376 (1st Cir. 1979). Instead, the government must carry the burden of showing that the challenged action furthers a vital public interest. *Abood*, 431 U.S. at 259–60, 97 S.Ct. 1782 (Powell, J., concurring in the judgment); *Elrod*, 427 U.S. at 362, 96 S.Ct. 2673 (plurality opinion); *Bates v. Little Rock*, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1959). In addition, it must appear that the benefit of the action in terms of service to an important public interest outweighs the detriment to protected freedoms. *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 560–67, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *United Public Workers v. Mitchell*, 330 U.S. 75, 96, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *see Morial v. Judiciary Commission of Louisiana*, 565 F.2d 295, 300 (5th Cir. 1977) (en banc) (discussing first amendment balancing test in this context),

*cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978). Finally, the challenged government action must be closely tailored to the service of its legitimate objectives, so as not to unnecessarily restrict constitutionally protected interests. *Kusper v. Pontikes*, 414 U.S. 51, 59, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Police Department of Chicago v. Mosley*, 408 U.S. 92, 101, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).[41]

 The fourteenth amendment analytical framework is similar. Government decisions which are based on impermissible classifications are subject to the strictest scrutiny. *Zablocki v. Redhail*, 434 U.S. 374, 388, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Bullock v. Carter*, 405 U.S. 134, 144, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *San Antonio School District v. Rodriguez*, 411 U.S. 1, 18–29, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Such classifications must reflect a compelling government interest, and be closely tailored so that no less drastic means is available towards meeting those interests. *See Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 184–185, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979) (collecting cases). *See generally* Note, *Legislative Purpose, Rationality, and Equal Protection*, 82 Yale L.J. 123 (1972).

Viewed under either first or fourteenth amendment analysis, the patronage practices challenged by the plaintiffs cannot withstand constitutional scrutiny. Indeed, the defendants have failed to put into issue sufficient facts to properly raise these interests. Even if they had, the interests raised are insufficient to justify the infringements of the plaintiffs' rights that the court has found in this case.

**B. The Defendants Have Not Properly Raised the Existence of Any Compelling State Interests**

The defendants have totally failed to meet their burden of showing that compel-

---

41. It is an interesting question whether the possibly unconstitutional effects of the defendants' patronage practices on employees' and applicants' own rights can be considered by a court in the first amendment "balance," even though the plaintiffs cannot raise such violations for purposes of determining liability, *see* pp. 1327–1329 *supra*. The court has not considered those effects in this case.

ling state interests justify the patronage practices. They have not properly placed before the court the existence of such interests.

Under Rule 56(e), Fed.R.Civ.P., it is the obligation of a party opposing a motion for summary judgment to go beyond the pleadings and the briefs to show the existence of a genuine issue of material fact. "[A]n adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Affidavits containing only conclusory allegations of ultimate facts or legal conclusions do not set forth the specific facts required by the rule. *See Askew v. Bloemker*, 548 F.2d 673, 679 (7th Cir. 1976); *Ashwell Co. v. Transamerica Insurance Co.*, 407 F.2d 762, 766 (7th Cir. 1969).

The only evidence in this case cited by the defendants as proof of the alleged state interests is the affidavit of John H. Stroger, Jr., who, as of May 11, 1978, the date of the affidavit, had been a member of the Board of County Commissioners for seven years and Democratic Ward Committeeman of the Eighth Ward for ten years. The operative portion of the affidavit is as follows:

I am making this affidavit to state my belief in the constructive ends served by the limited patronage employment in Chicago and Cook County, as follows:

a. It tends to recruit a work force with an equitable distribution of jobs geographically.

b. It insures an equitable distribution so far as minorities and various ethnic groups are concerned.

c. It enables an officeholder in filling vacancies to recruit persons sympathetic with his philosophy of the management of government and public service.

d. It serves as a leaven of interested and ambitious persons in a work force otherwise recruited by "Civil Service methods." (Compare, President Carter's complaints of an obdurate Civil Service bureaucracy.)

e. It offers an opportunity to recruit handicapped persons into the work force. Their employment is a matter of public concern.

f. It recruits persons who increase the productivity of the work force because of their ambition to advance.

g. It offers a training ground for persons interested in a career in local government.

h. It furnishes an opportunity to persons from areas disadvantaged, both economically and socially, to rise to positions of influence, where they can be of real service, not only to their community, but to their city, county, state and country as a whole. If the federal court were to enjoin all patronage hiring in Chicago and Cook County, it would be denying now to Blacks and Hispanics the opportunity historically enjoyed by other ethnic groups, at this time in history, when Blacks and Hispanics are becoming the dominant voting power because of their numbers in urban America.

i. It tends to give officeholders representatives throughout the communities of the city and county. This can be an important matter at all times, but particularly in time of crisis. For example, during the riots of the late 1960's, precinct leaders with their intimate association with their neighbors were perhaps the main influence for stabilizing things and bringing them back to normal.

These allegations are completely conclusory. With the possible exception of the last one, they are totally devoid of any specific facts that would support the contentions involved. The court finds that they are insufficient to raise a genuine issue of material fact pursuant to Rule 56(e). They are especially inadequate in light of the heightened burden on the government in this case. *See Abood v. Detroit Board of Education*, 431 U.S. at 259, 97 S.Ct. 1782, 1812, 52 L.Ed.2d 261 (Powell, J., concurring in the judgment) (" 'the [governmental] interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such

an interest. . . . .' ") (quoting *Elrod,* 427 U.S. at 362, 96 S.Ct. 2673 [plurality opinion]).

### C. Even If They Are Properly Raised, the Interests Advanced by the Defendants Are Not Sufficient to Justify the Challenged Patronage Practices

Even if the interests raised by the defendants in the Stroger affidavit, along with certain other interests discussed in their briefs, may be considered by the court, those interests are insufficient to withstand the strict constitutional scrutiny that must be applied. The court will consider the interests raised by the defendants and demonstrate how each interest is insufficient.

Goals a, b, e, g, and h of the Stroger affidavit all involve the problem of recruiting particular groups or persons into government service. There is no reason, however, that such recruitment could not be conducted within a civil service system. Extra weight in employment or termination decisions could be given to the factors involved in a, b, e, g, and h. Even without civil service protection, these goals could be attained in a non-merit system that did not give preferences to those with political sponsorship. The words of Mr. Justice Stevens, sitting as Circuit Judge in *Illinois State Employees Union v. Lewis,* 473 F.2d 561 (7th Cir. 1972) *cert. denied,* 410 U.S. 928, 943, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973), illustrate this point.

Neither this court nor any other may impose a civil service system upon the State of Illinois. The General Assembly has provided an elaborate system regulating the appointment to specified positions solely on the basis of merit and fitness, the grounds for termination of such employment, and the procedures which must be followed in connection with hiring, firing, promotion, and retirement. A federal court has no power to establish any such employment code.

However, recognition of plaintiffs' claims will not give every public employee civil service tenure and will not require the state to follow any set procedure or to assume the burden of explaining or proving the grounds for every termination [or refusal to promote or hire] . . . There is a clear distinction between the grant of tenure to an employee—a right which cannot be conferred by judicial fiat—and the prohibition of a discharge [or refusal to hire or promote] for a particular impermissible reason. The Supreme Court has plainly identified that distinction on many occasions, most recently in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

Unlike a civil service system, the Fourteenth Amendment to the Constitution does not provide job security, as such, to public employees. If, however, a discharge [or a refusal to hire or promote] is motivated by considerations of race, religion, or punishment of constitutionally protected conduct, it is well settled that the State's action is subject to federal judicial review.

473 F.2d at 567–68. Since there are less drastic means available to meet these proposed goals, they are not sufficient to justify the patronage practices. *See Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979); *Kusper v. Pontikes,* 414 U.S. 51, 59, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Police Department of Chicago v. Mosley,* 408 U.S. 92, 101, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

Goals d and f are similar to those discussed above. They are aimed at recruiting certain persons, but they are also aimed at using non-merit appointments to correct certain perceived flaws with the civil service system. Once again, though, there is no reason that these goals could not be served by a non-merit system that did not take political work or affiliation into account. Thus, less drastic means are available to meet these goals.

Goal i can also be met through less drastic means. If the desire is to have government employees living in every geographical area, as in goal a, recruitment can be based in part on geographic considerations

without involving political considerations. On the other hand, if the goal is to have a political representative of officeholders in each neighborhood, there is no reason why the defendants could not build up a network of contacts in neighborhoods, perhaps including their precinct captains, to serve that function. Both networks, governmental and political, could exist simultaneously. In any event, there has been no showing that the continuance of the patronage system is necessary to the achievement of this interest.[42]

The last of the goals discussed in the Stroger affidavit is c, enabling an officeholder in filling vacancies to recruit persons sympathetic with his philosophy of the management of government and public service. This goal is closely related to the goals discussed by the defendants in their briefs. In the Memorandum of Non-Consenting Defendants in Opposition to the Plaintiffs' Motion for Partial Summary Judgment at 24, and in the brief in support of their counter-motion for summary judgment at 30–32, the non-consenting defendants raise the governmental interests that were considered and rejected by the Supreme Court in the *Elrod* case. These interests, as discussed in the plurality opinion, include the absence of any right to government employment, the need to ensure effective government and the efficiency of public employees, the increased accountability to the public of patronage employees, the need for political loyalty of employees in order to assure that representative government is not undercut by obstructionist tactics, and the preservation of the democratic process. 427 U.S. at 360–72, 96 S.Ct. 2673.[43]

The court holds that the *Elrod* plurality opinion, insofar as it rejected these asserted interests as a defense for patronage firings, is in accord with the law of this circuit, and is directly and equally applicable to patronage hiring and promotional practices. Then-Judge Stevens' opinion for the Seventh Circuit in *Illinois State Employees Union v. Lewis*,[44] 473 F.2d 561 (7th Cir. 1972), *cert. denied*, 410 U.S. 928, 943, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973), establishes that the *Elrod* defenses are insufficient.[45]

In his opinion, Justice Stevens rejected the goals raised by the defendants. Justice Stevens directly rejected the first goal, the absence of a right to public employment. 473 F.2d at 573–74. Then, under a slightly different framework, he rejected the others.

Absent some proof that political loyalty was particularly important for specific classes of workers, Justice Stevens held, general defenses based on a need for political loyalty were insufficient to withstand constitutional scrutiny[46]. 473 F.2d at 574.

---

**42.** The court notes that many of the interests discussed above are not sufficiently compelling to justify the challenged patronage practices, even if the defendants could show that the practices were a necessary means towards achieving those goals.

**43.** Many of the arguments made by the defendants confuse the best interests of the government and the best interest of the Democratic party. " '[C]are must be taken not to confuse the interest of partisan organizations with governmental interests.' " *Abood*, 431 U.S. at 260, 97 S.Ct. at 1812 (Powell, J., concurring in the judgment) (quoting *Elrod*, 427 U.S. at 362, 96 S.Ct. 2673 [plurality opinion]).

**44.** "The holding of *Shakman* is in complete accord with our decision here." *Lewis*, 473 F.2d at 569 n.17.

**45.** *Lewis* has been repeatedly relied on in subsequent Seventh Circuit cases, *see, e. g., Newcomb v. Brennan*, 558 F.2d 825, 827, 830 (7th Cir.) *cert. denied*, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977); *Hostrop v. Board of Junior College District No. 515*, 471 F.2d 488, 495 n.16 (7th Cir. 1972), *cert. denied*, 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973), and was specifically reaffirmed in *Burns v. Elrod*, 509 F.2d 1133, 1135 (7th Cir. 1975) *affd* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

**46.** It is the court's understanding that the plaintiffs are not challenging the defendants' use of political considerations in their employment decisions concerning policymaking officials, *see Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Newcomb v. Brennan*, 558 F.2d 825 (7th Cir.) *cert. denied*, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977). The court's decision today does not affect government employees who are in that category.

Finally, Justice Stevens disapproved defenses based on a claim that the interests of government efficiency and of preservation of the democratic process support patronage practices. 473 F.2d at 574–76. He concluded that:

> reflection persuades us that in the long run the State's strong interest in efficient management is at least consistent with, and may well favor, the recognition and protection of the constitutional rights asserted in this case.

> Of greater significance is the fact that as the number of employees affected is increased, the importance of preserving their First Amendment freedoms likewise grows. Indeed, when numbers are considered, it is appropriate not merely to consider the rights of a particular janitor who may have been offered a bribe from the public treasury to obtain his political surrender, but also the impact on the body politic as a whole when the free political choice of millions of public servants is inhibited or manipulated by the selective award of public benefits. While the patronage system is defended in the name of democratic tradition, its paternalistic impact on the political process is actually at war with the deeper traditions of democracy embodied in the First Amendment.

473 F.2d at 575–76.

Although the factors to be weighed in a strict scrutiny analysis may differ slightly in this case from those present in *Elrod* and *Lewis,* the court holds that the result must be the same. The defendants' interests asserted in all cases are effectively the same, and the question of the presence of any less drastic means to achieve the government's interests must be determined identically. The only possible difference concerning the application of the test in this case as compared to its application in *Elrod* and *Lewis* is the importance of the plaintiffs' interests infringed by the patronage practices.

 This court will not attempt to determine whether the rights of candidates and voters at issue here are either more or less important than the right of government employees to retain their jobs without regard to their political affiliations. Both are clearly important constitutional interests, and the result of the strict scrutiny test must be the same. The challenged patronage practices are unconstitutional.

## XII. CONCLUSION

Ever since the Court of Appeals for the Seventh Circuit issued its opinion in this case nine years ago, the parties have attempted, for the most part, to work out their differences. The plaintiffs entered into a consent decree with most of the defendants in this case. They negotiated stipulated factual admissions with the defendants currently before the court. The plaintiffs, the consenting Democratic defendants, and the non-consenting Democratic defendants then filed cross-motions for summary judgment. This was done because both sides recognized an interest in avoiding a trial in this case.

A trial in this case would be lengthy and difficult. It would probably involve taking the testimony of most of the defendants in this case, who hold important official positions. It would be disruptive of the ongoing conduct of the business of many government institutions in this area. Also, a trial would be very expensive, and involve the consumption of a great amount of public funds, as well as the resources of the individual parties.[47]

> It is not the court's role to determine whether these benefits would outweigh the burdens that a trial would entail. That is a decision that must be made by the parties, consistent with the applicable law and the Federal Rules of Civil Procedure.

---

47. The court notes, however, that a trial of the issues in this case would have general educational value. Under the spirit of the first amendment, it would be beneficial to the public for it to receive a full and detailed demonstration of how the electoral and public employment processes actually work in Cook County.

Thus, the parties, in an admirable spirit of conciliation, have endeavored to put this case in a position where the court could resolve it without the necessity of a public trial.[48] The court has found that under Rule 56 of the Federal Rules of Civil Procedure, which governs the granting of a summary judgment, it is able to deny the defendants' motions for summary judgment on counts I, II, IV, and V of the amended complaint, and to grant the plaintiffs' motions for partial summary judgment on the issue of liability on those counts as to these defendants.[49]

The court holds that the plaintiffs have a right to an electoral process free from deliberate governmental discrimination against their views. The factual record before the court conclusively demonstrates, beyond any existence of a genuine issue of material fact, that the defendants deliberately use the challenged patronage practices to help elect regular Democrats and help defeat their opponents. This purposeful, deliberate discrimination gives the defendants an actual, significant advantage in elections.

This is not to say, of course, that patronage workers are the dominant force in every election. The plaintiffs do not claim that they are. The parties agree that many factors, including campaign money, television exposure, racial or ethnic background, etc., may influence the outcome of the election. The point is that patronage workers give an important advantage to regular Democrats. The regular Democratic defendants are using the government to further their own political interests by giving preferences for many government jobs only to those who have worked and/or will promise to work for regular Democratic candidates.

The court concludes that the patronage practices challenged by the plaintiffs infringe their rights as candidates and voters under the first and fourteenth amendments to the Constitution of the United States and 42 U.S.C. §§ 1983, 1985. The challenged practices are not necessary to the furthering of any compelling government interest. Accordingly, the court holds that the challenged practices violate the Constitution of the United States.

The court hereby sets a status hearing for Friday, October 12, 1979, at 10:00 a. m. All parties are invited to attend. At that time, the court will entertain suggestions as to the manner in which it should proceed in order to determine the proper remedy in this case.[50] The court trusts that the parties will work together in the creation of the remedy, as they have worked together in the previous phases of this litigation.[51]

IT IS SO ORDERED.

---

**48.** The court fully recognizes that a trial cannot be avoided merely because both sides have filed motions for summary judgment. 6 Moore's Federal Practice ¶ 56.13, at 56–341 (2d ed. 1976) (collecting cases).

**49.** The plaintiffs' motions for summary judgment on counts III and VI of the amended complaint are denied, and the defendants' motions for summary judgment on these counts are granted. *See* note 1 *supra.*

**50.** *See generally* Chayes, *The Role of the Judge in Public Law Litigation,* 89 Harv.L.Rev. 1281 (1976); Altman, *Implementing a Civil Rights Injunction: A Case Study of* NAACP v. Bren-

nan, 78 Colum.L.Rev. 739 (1978); Berger, *Away from the Court House and Into the Field: The Odyssey of a Special Master,* 78 Colum.L. Rev. 707 (1978); *Special Project—The Remedial Process in Institutional Reform Litigation,* 78 Colum.L.Rev. 783 (1978). *See also* O. Fiss, *The Civil Rights Injunction,* (1978); note 28 *supra.*

**51.** The court will also entertain suggestions, if necessary, as to the propriety and advisability of certifying this interlocutory summary judgment order for immediate appeal pursuant to 28 U.S.C. § 1292(b). *See* 10 C. Wright & A. Miller, Federal Practice and Procedure § 2715.

**1356**

APPENDIX

CONSENT JUDGMENT ENTERED MAY 5, 1972

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
.EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL L. SHAKMAN and PAUL M. LURIE et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 69 C 2145 |
| | ) ) | |
| THE DEMOCRATIC ORGANIZATION OF COOK COUNTY, etc., . . . the REPUBLICAN COUNTY CENTRAL , COMMITTEE OF COOK COUNTY et al., | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## JUDGMENT

Plaintiffs Michael L. Shakman and Paul M. Lurie having filed their complaint herein, and said plaintiffs (on behalf of themselves and the classes they represent under the First Amended Complaint herein as determined by previous Orders of Court) and the defendants named in paragraph C hereof having consented to the entry of this Judgment as to such parties without trial and without adjudication of any allegation in the complaint or any issue of fact with respect to the alleged commission by said defendants of any unconstitutional, unlawful or wrongful act, and without this Judgment constituting evidence of or an admission by any defendant with respect to any issue of fact herein or the commission of any unconstitutional, unlawful or wrongful act;

Now, therefore, upon the consent the parties as aforesaid, it is hereby Ordered, Adjudged and Decreed as follows:

A. This Court has jurisdiction of the parties to this Judgment and of the subject matter of this action under Sections 1331 and 1343(3) of Title 28 of the United States Code.

B. As used herein, (1) the term "governmental employment" means any employment (whether full-time or part-time, permanent or temporary, and regardless of whether the employment is paid for by federal funds) by or for the City of Chicago or any employment within the Northern District of Illinois by or for any other governmental entity other than an entity of the federal government; (2) the terms "governmental employee" and "employee" mean a person employed in governmental employment.

C. The provisions of this Judgment apply to each and all of the following: (1) defendant The Democratic Organization of Cook County, a corporation; (2) defendant Democratic County Central Committee of Cook County and all members thereof; (3) defendant City of Chicago, a municipal corporation; (4) defendant Richard J. Daley, individually and as President of the Democratic Organization of Cook County, Chairman of the Democratic County Central Committee Of Cook County, Mayor of the City of Chicago and Democratic Party Ward Committeeman for the Eleventh Ward of the City of Chicago; (5) defendant

Matthew Bieszczat, individually and as Secretary of The Democratic Organization Of Cook County, Secretary of the Democratic County Central Committee of Cook County, member of the Board of County Commissioners of Cook County and Democratic Party Ward Committeeman for the Twenty-Sixth Ward of the City of Chicago; (6) defendant Marshall Korshak, individually and as Democratic Party Ward Committeeman for the Fifth Ward of the City of Chicago; (7) defendant George W. Dunne, individually and as President of the Board of County Commissioners of Cook County and as Democratic Party Ward Committeeman for the Forty-Second Ward of the City of Chicago; (8) defendant P. J. Cullerton, individually and as County Assessor of Cook County and as Democratic Party Ward Committeeman for the Thirty-Eighth Ward of the City of Chicago; (9) defendant Edward J. Barrett, individually and as County Clerk of Cook County and as former Democratic Party Ward Committeeman for the Forty-Fourth Ward of the City of Chicago; (10) defendant Matthew J. Danaher, individually and as Clerk of the Circuit Court of Cook County; (11) defendant Richard B. Ogilvie, individually and as Governor of the State of Illinois; (12) defendant Edmund J. Kucharski, individually and as Chairman of the Republican County Central Committee of Cook County; (13) defendant William J. Scott, individually and as Attorney General of the State of Illinois; (14) defendant John W. Lewis, individually and as acting Secretary of State of Illinois; (15) defendant Paul Simon, individually and as Lieutenant Governor of the State of Illinois; (16) defendant Alan Dixon, individually and as Treasurer of the State of Illinois; (17) defendant Michael Bakalis, individually and as Superintendent of Public Instruction of the State of Illinois; (18) defendant Metropolitan Sanitary District of Greater Chicago, a municipal corporation; (19) defendant John E. Egan, individually and as President of the Metropolitan Sanitary District of Greater Chicago; (20) defendant Joseph C. Doring, individually and as Sheriff of Kane County, Illinois; (21) defendant William A. Vollrath, individually and as County Clerk of Kane County, Illinois; (22) defendant Jack M. Weidner, individually and as Coroner of Kane County, Illinois; (23) defendant James H. Fitzgerald, individually and as Treasurer of Kane County, Illinois; (24) defendant Jan E. Carlson, individually and as Clerk of the Illinois Circuit Court for the Sixteenth Judicial Circuit, Kane County, Illinois; (25) defendant James A. Callahan, individually and as Sheriff of LaSalle County, Illinois; (26) defendant George L. Hunter, individually as [sic] as County Clerk of LaSalle County, Illinois; (27) defendant Ray Rathbun, individually and as Treasurer of LaSalle County, Illinois; (28) defendant Republican State Central Committee of Illinois and all members thereof; (29) defendant Victor L. Smith, individually and as Chairman of the Republican State Central Committee of Illinois; (30) defendant William F. Scannell, individually and as Secretary of the Republican State Central Committee of Illinois; (31) defendant Timothy Sheehan, individually and as Republican Committeeman for the Forty-First Ward of the City of Chicago; (32) defendant Joseph Woods, individually and as a Commissioner of Cook County; (33) defendant Floyd Fulle, individually, as a Commissioner of Cook County and as Republican Committeeman for Maine Township; (34) defendant Charles J. Grupp, individually, as a Commissioner of Cook County and as Republican Committeeman for Bloom Township; (35) defendant William N. Erickson, individually, as a Commissioner of Cook County and as Republican Committeeman for Evanston Township; (36) defendant Eugene Leonard, individually, as Bremen Township Assessor and as Republican Committeeman for Bremen Township; (37) defendant William E. Kane, individually, as Orland Township Assessor and as Republican Committeeman for Orland Township; (38) defendant John J. Nimrod, individually, as Niles Township Supervisor and as Republican Committeeman for Niles Township; (39) defendant Bernard Pederson, individually, as Palatine Township Assessor and Republican Committeeman for Palatine Township; (40) defendant John F. Kimbark, individually, as Clerk of both the Town of Cicero and Cicero Township and as Republican Committee-

man for Cicero Township; (41) defendant Elmer N. Conti, individually, as President of the Village of Elmwood Park and as Republican Committeeman for Leyden Township; (42) defendant Frank A. Bella, individually, as Calumet Township Collector and as Republican Committeeman for Calumet Township; (43) the successors of each of the foregoing defendants in each of their aforesaid capacities; and to (44) the present and future officers, members, agents, servants, employees and attorneys of each of the defendants and others named or referred to hereinabove, and all others in active concert or participation with any of the defendants or others named or referred to in (1) through (44) above who receive actual notice of this Judgment by personal service or otherwise.

D. It is declared that compulsory or coerced political financial contributions by any governmental employee, contractor or supplier, to any individual or organization and all compulsory or coerced political activity by any governmental employee are prohibited, and, once hired, a governmental employee is free from all compulsory political requirements in connection with his employment. However, governmental employees may engage on a voluntary basis, on their own time, in any lawful political activity (including the making of political financial contributions).

E. Each and all of the defendants and others named or referred to in Paragraph C above are permanently enjoined from directly or indirectly, in whole or in part:

(1) conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor.

(2) knowingly causing or permitting any employee to do any partisan political work during the regular working hours of his or her governmental employment, or during time paid for by public funds; provided that nothing contained in this subparagraph (2) shall prohibit governmental employees from voluntarily using vacation time, personal leave time or from taking nonpaid leaves of absence to do political work, but permission to do so must be granted nondiscriminatorily.

(3) knowingly, inducing, aiding, abetting, participating in, cooperating with or encouraging the commission of any act which is proscribed by this paragraph E, or threatening to commit any such act.

F. Each defendant named or referred to in paragraph C above shall give notice of this Judgment, in the manner directed by this Court, to the employees under said defendant's jurisdiction.

G. This Judgment represents the agreed-to disposition of the claims asserted in this case by plaintiffs Michael L. Shakman and Paul M. Lurie, on behalf of themselves and the classes referred to above, against the defendants named in paragraph C above. Plaintiffs' claims for money damages, compensatory and exemplary, against the defendants named in paragraph C above are hereby dismissed.

H. Jurisdiction is retained for the following purposes:

(1) To enable the parties to this Judgment to continue to litigate the following questions before this Court:

(a) Certain governmental employment positions under the jurisdiction of the defendants who are parties to this Judgment by their nature involve policy-making to such a degree or are so confidential in nature as to require that discharge from such positions be exempt from inquiry under this Judgment. Jurisdiction is maintained to litigate the question of which governmental employment positions under such defendants' jurisdiction are so exempt for the foregoing reasons.

(b) Can political sponsorship or other political considerations be taken into account in hiring employees? If so, to what extent can such considerations be taken into account?

(c) What remedies and implementing procedures ought to be granted and established by the court in connection with

the resolution of the questions raised in the foregoing subparagraphs (a) and (b)?

(2) To enable the parties to this Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Judgment, for the enforcement of compliance with the provisions contained herein, and for the punishment of the violation of any of such provisions. Application to enforce such provisions or to impose punishment for any such violation may be presented to this Court by any registered voter. Prior written notice of all such applications and other matters in this action shall be given to the named parties hereto. Except where emergency relief is sought, 7 days written notice shall be given.

I. The Court expressly finds and determines, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that there is no just reason for delay and directs that this Judgment be entered forthwith.

ENTER:

/s/ Abraham L. Marovitz

District Judge

Dated: 5/5/72 , 1972.